**In re CORONA PLASTICS,
INC., Debtor.**

**Bankruptcy No. 85–01877.**

United States Bankruptcy Court,
D. New Jersey.

Jan. 12, 1989.

Schwartz, Tobia & Stanziale by Raymond T. Lyons, Jr., Montclair, N.J., for trustee.

Benenson & Scher by Jay Benenson, Millburn, N.J., for Secured Creditor.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime by Paul Kizel, Roseland, N.J., for Laura Associates.

## OPINION

VINCENT J. COMMISA, Chief Judge.

This matter comes before the Court on two motions, one brought by the Se-

cured Creditor and one by the Trustee. The Secured Creditor seeks the entry of an Order which authorizes the turnover by the Trustee of its collateral, which constitutes substantially all of the Debtor's assets. In conjunction with this motion, the Trustee seeks approval from this Court to turnover the collateral without complying with the terms of the New Jersey Environmental Cleanup Responsibility Act ("ECRA"). This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

The factual background pertinent to these matters is as follows: Corona Plastics, Inc. ("the Debtor") is engaged in the business of manufacturing and selling plastic cosmetic compacts. The Debtor operated two manufacturing facilities: one in Denville, New Jersey, which is the subject of the instant motions, and another in Nuevo Laredo, Mexico. On April 15, 1985, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor's operations, at that time, were controlled by Joseph P. Contreras and his family. On October 11, 1985, this Court ordered that a Trustee be appointed. Pursuant to that Order, Jack Birnberg was appointed as the Chapter 11 Trustee.

Prior to its Chapter 11 filing, Corona Plastics had entered into a financing arrangement with Gibraltar Corporation of America ("Gibraltar"), pursuant to which Gibraltar had obtained a security interest in all of the Debtor's assets, including machinery, equipment and accounts receivable. This secured claim was approved by the Court in a Financing Order dated April 24, 1985.

In approximately February, 1985, two months before the Debtor's Chapter 11 filing, Gibraltar entered into a Participation Agreement with Florence Warehouse, Inc. ("FWI"), whose principal is Gerry Mecca ("Mecca"). FWI, through this agreement, would advance funds to the Debtor through Gibraltar.[1]

Subsequently, in accordance with an Order of this Court dated November 18, 1986, Gibraltar assigned its security interest to FWI, and FWI began advancing funds directly to the Debtor. During this period, the Debtor was experiencing severe cash flow shortages and was operating at a tremendous loss. FWI, initially through Gibraltar, and eventually on its own, was funding these cash flow shortages, thereby increasing the amount of debt owed to it by the Debtor.

Also during this period, the Trustee was involved in litigation with Joseph P. Contreras, seeking to recover control of the Mexican operation for the Debtor. Despite Contreras' contention that the Mexican manufacturing operation was not owned by the Debtor, this Court, in March of 1987, ordered that the Mexican plant, Corona De Los Dos Laredo, S.A., be substantively consolidated with the Debtor. The Trustee took possession of the Mexican operation in July of 1987, and since that time has continued to operate the plant without any involvement on the part of Joseph Contreras or his family.[2] However, even after the Trustee took control of the Mexican plant, the Debtor, as a result of transition expenses and unpaid liabilities in Mexico, was still experiencing cash flow problems, which were funded by FWI. It was not until late 1987 that the financial condition of the Debtor improved sufficiently to meet operating expenses.

As noted above, the Debtor operated a manufacturing plant in Denville, New Jersey. This plant was leased from Laura Associates, a New Jersey partnership. The lease commenced on January 9, 1978, and expired on December 31, 1987. At the termination of the lease, the Debtor vacated the Denville premises, and sent all useful machinery and equipment to the Debtor's other plant in Nuevo Laredo, Mexico. The excess equipment was auctioned off in December of 1987.

---

1. In addition, Mecca was given an 18 month option, commencing in April of 1985, to purchase 80% of the Corona stock. This option was never exercised.

2. Mr. Contreras was found guilty of bankruptcy crimes and is currently serving out his sentence for those crimes in a federal penitentiary in Pennsylvania.

Additionally, upon the expiration of the lease, the Trustee applied to the Court for an Order approving the employment of a consultant to assist the Trustee in complying with the provisions of the Environmental Cleanup Responsibility Act ("ECRA"). The Act is codified at N.J.S.A. 13:1 K–6, *et seq.* The provision with which the Trustee attempted to comply was N.J.S.A. 13:1 K–9, which provides in pertinent part:

a. The owner or operator of an industrial establishment planning to close operations shall:

(1) Notify the department in writing, no more than five days subsequent to public release, of its decision to close operations;

(2) Upon closing operations, or 60 days subsequent to public release of its decision to close or transfer operations, whichever is later, the owner or operator shall submit a negative declaration or a copy of a cleanup plan to the department for approval and a surety bond or other financial security for approval by the department guaranteeing performance of the cleanup in an amount equal to the cost estimate for the cleanup plan.[3]

In accordance with the procedures mandated by the statute, the Court authorized the Trustee to employ the consulting firm of Envirosciences, Inc. to test the Denville premises for environmental contamination. Envirosciences conducted a preliminary investigation of the site and determined that further testing, including soil sampling and tank testing, would be necessary to prepare the documents required by ECRA. The cost of the further investigation was estimated to be between $14,175.00 and $31,875.00. Gerry Mecca, as principal of FWI, has refused to advance any funds or to authorize the use of cash collateral as payment for these expenses.

Subsequently, FWI brought the motion which is at the crux of this Opinion, seeking an Order authorizing the Trustee to turn over all collateral, including equipment, machinery and accounts receivable. The Trustee, before surrendering the collateral to FWI, seeks a determination that under these circumstances, he is not responsible for the procedures required by ECRA.

Laura Associates ("Laura" or "the Landlord") objects to the transfer of the collateral unless the Trustee first complies with

---

**3.** For ease of reference, the Court has set forth below pertinent definitions as provided by N.J.S.A. 13:1 K–8:

a. "Cleanup plan" means a plan for the cleanup of industrial establishments, approved by the department, which may include a description of the locations, types and quantities of hazardous substances and wastes that will remain on the premises; a description of the types and locations of storage vessels, surface impoundments, or secured landfills containing hazardous substances and wastes; recommendations regarding the most practicable method of cleanup; and a cost estimate of the cleanup plan....

b. "Closing, terminating or transferring operations" means the cessation of all operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances and wastes, or any temporary cessation for a period of not less than two years, or any other transaction or proceeding through which an industrial establishment becomes nonoperational for health or safety reasons or undergoes change in ownership, except for corporate reorganization not substantially affecting the ownership of the industrial establishment, including but not limited to sale of stock in the form of a statutory merger or consolidation, sale of the controlling share of the assets, the conveyance of the real property, dissolution of corporate identity, financial reorganization and initiation of bankruptcy proceedings;

. . . .

f. "Industrial establishment" means any place of business engaged in operations which involve the generation, manufacture, transportation, treatment, storage, handling, or disposal of hazardous substances or wastes onsite, above or below ground, having a Standard Industrial Classification number within 22–39 inclusive, 46–49 inclusive, 51 or 76 as designated in the Standard Industrial Classifications Manual prepared by the Office of Management and Budget in the Executive Office of the President of the United States....

g. "Negative declaration" means a written declaration, submitted by an industrial establishment and approved by the department, that there has been no discharge of hazardous substances or wastes on the site, or that any such discharge has been cleaned up in accordance with procedures approved by the department, and there remain no hazardous substances or wastes at the site of the industrial establishment.

ECRA. Laura contends that as it has been conceded that the Debtor's Denville operation was an "industrial establishment," the Trustee has no choice but to comply with the procedures mandated by ECRA. Laura bases this contention upon several grounds. First, it maintains that the case of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), which held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety" is applicable to the instant case.

Next, Laura alleges that the Trustee's failure to comply with ECRA would constitute a breach of his duties under 28 U.S.C. § 959(b), which states that a trustee must "manage and operate the property in his possession ... according to the requirements of the valid laws of the state in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." It is Laura's position that the ECRA requirements are the type of laws contemplated under the statute, and therefore must be followed by the Trustee.

Additionally, Laura states that Section 506(c) of the Code provides a basis for the use of FWI's collateral to fund the costs of ECRA compliance. Section 506(c) provides that a trustee may use a secured creditor's collateral for certain costs of preserving or disposing of a debtor's estate, in an amount equal to the benefit of such use inuring to the secured creditor. Laura contends that Section 506(c) is applicable, as FWI will benefit from the Trustee's compliance with ECRA.

Finally, Laura posits that FWI's involvement with the Debtor's operations are such that the Court should find that FWI is an "operator" and is thus responsible for ECRA procedures under N.J.S.A. 13:1 K–9.

Both the secured creditor and the Trustee object to these contentions on various grounds. First, FWI and the Trustee strongly object to Laura's characterization of FWI as an "operator" for ECRA purposes, and maintain that FWI (through its principal, Mecca) was merely concerned with protecting its considerable investment and was not involved with the daily decisions and operations of the Debtor's business. Both parties also assert that the case relied upon by Laura for its position that the Trustee is liable under ECRA *(Midlantic, supra,)* is inapposite to the instant case, as *Midlantic*, unlike this case, involved property of the estate which was subject to abandonment by the Trustee, upon which actual hazardous substances had been found.

The Trustee further objects to Laura's contention that Section 506(c) of the Code is applicable. This objection is grounded on the Trustee's position that as the Debtor does not own the property which is the subject of the ECRA action, the secured creditor would reap no benefit from the property being brought into ECRA compliance.

Finally, the Trustee alleges that even if the Court finds that the costs of ECRA compliance are chargeable as an administrative expense, such expenses should not prime the secured creditor's lien on the assets of the Debtor. The Court now turns to address the contentions of the parties as set forth above.

## I. APPLICABILITY OF MIDLANTIC

The Landlord alleges that "[t]he Trustee has no choice but to comply with ECRA ... [and that] [t]he Court cannot enter an Order voiding his obligations."[4] This allegation is grounded on Laura's contention that the Court should apply the ruling in *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) to the matter *sub judice*. The case involved a corporation, Quanta Resources, which owned and operated waste oil storage and processing facilities in New York and New Jersey. It was discovered by the New Jersey Department of Environmental Protection ("NJDEP") that Quanta, in violation of its temporary operating permit,

---

**4.** See Letter Brief of Laura Associates, dated 9/9/88, at 9.

had accepted over 400,000 gallons of oil contaminated with polychlorinated biphenyls ("PCB's"), which are highly toxic carcinogens. NJDEP ordered Quanta to cease operations at its New Jersey site. Before a cleanup plan was completed, however, Quanta filed a petition under Chapter 11 of the Bankruptcy Code. Subsequently, the plan was converted to a liquidation under Chapter 7, and a trustee was appointed. The trustee, in light of the tremendous cost of cleanup of the site and its burden on the estate, moved to abandon the property pursuant to 11 U.S.C. § 554. *Id.* 106 S.Ct. at 757–58.

The Bankruptcy Court approved the abandonment, and NJDEP took a direct appeal of the approval to the Court of Appeals, pursuant to Sec. 405(c)(1)(B) of the Bankruptcy Act of 1978. The Court of Appeals reversed. This reversal was upheld by the Supreme Court, which recognized a "narrow" exception to the trustee's abandonment power under Section 554. The Court stated: "Neither the Court nor Congress has granted a trustee in bankruptcy power that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." *Id.* 106 S.Ct. at 762. Laura urges the Court to apply *Midlantic* to the instant case and to conclude that its holding mandates the Trustee's full ECRA compliance. The Court, for reasons set forth below, declines to apply *Midlantic* to the case before it.

First, it is clear that if the instant matter involved a proposed abandonment of the Debtor's property by the Trustee, this Court would be bound by the Supreme Court's ruling in *Midlantic*. However, this matter involves a turnover of collateral to a secured creditor, not an abandonment of contaminated property, as in *Midlantic*. In *In the Matter of Commonwealth Oil Refining Company, Inc.,* 805 F.2d 1175 (5th Cir.1986), a debtor urged the Court to accept its analogy that the *Midlantic* standard should apply to automatic stay procedures under § 362(b)(4). *Id.* at 1184–85. The Court, in refusing to accept this analogy, stated that "the question before the Court in *Midlantic* was the scope of the

abandonment power and it is *that* power which is limited ... [by considerations of public health and safety]." *Id.* at 1185, emphasis in original. Thus, it is clear that *Midlantic* is not controlling in a case which does not involve abandonment.

Additionally, the Court notes that the facts of *Midlantic* are clearly distinguishable from the facts of the case at bar. There, the Court was seeking to protect the state and its citizens from abandonment of property, owned by the debtor, which was indisputably contaminated with a highly toxic chemical. The Court's decision was informed by its recognition that a known danger existed at the site. Here, there has been no determination that any environmental threat exists. In addition, the subject property is not owned by the Debtor. These factors compel the Court to decline to accept Laura's argument that *Midlantic* mandates compliance by the Trustee in the instant matter.

## II. THE APPLICABILITY OF 28 U.S.C. § 959(b)

Laura, in its moving papers, contends that the Trustee's failure to comply with ECRA would constitute a breach of his duties under 28 U.S.C. § 959(b). As noted above (see p. 234, *supra*), this section mandates that a trustee must operate the property over which he has control according to the laws of the state in which the property is located in the same way the owner of the property would be bound to do.

However, this Court is not convinced that § 959(b) is applicable to the present case, wherein the Trustee is disposing of the assets of the Debtor. This issue was addressed by the Supreme Court in *Midlantic, supra*. There, the debtors advanced the proposition that § 959(b) is relevant only when the trustee is actually operating the business of the debtor, and not when he is liquidating it. The Court declined to expressly hold that the section is applicable to liquidating trustees and instead held that, generally, the section supported the conclusion that "Congress did not intend for the Bankruptcy Code to pre-empt all

state laws that otherwise constrain the exercise of the trustee's powers." *Id.* 106 S.Ct. at 762.

Furthermore, in *Matter of Borne Chemical Co., Inc.,* 54 B.R. 126 (Bkrtcy.D.N.J. 1984), the Court expressly held that "§ 959(b) is applicable only where the property is being managed or operated for the purpose of continuing operations ..." The Court, in reviewing the history of the section, stated that the "purpose of the statute is to negate the idea that a trustee or debtor in possession 'could ignore the rules of law of the state of operation affecting the *conduct of business* committed to his charge.'"[5] *Id.* at 135, quoting *Palmer v. Webster & Atlas National Bank,* 312 U.S. 156, 166, 61 S.Ct. 542, 546–47, 85 L.Ed. 642 (1941) (emphasis added). Where, as here, the Trustee is not conducting business, but instead is disposing of the assets of the estate, § 959(b) is not applicable.

### III. "BENEFIT" UNDER 11 U.S.C. § 506(c)

■ Laura also maintains that the use of FWI's collateral is consonant with Section 506(c) of the Code, which provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving or disposing of such property to the extent of any benefit to the holder of such claim.

The party seeking relief under § 506(c) has the burden of showing the lienholder benefited as a result of the use of its collateral. *In re Ralph Fazio,* 57 B.R. 316 (Bkrtcy.E.D.Pa.1986); *In re Roggio,* 49 B.R. 450 (Bkrtcy.D.Conn.1985); *In re Matter of Belew,* 44 B.R. 12 (Bkrtcy.N.D.Ala.1984). In support of this burden, Laura offers only the statement that "the Trustee cannot turnover or abandon the assets to FWI without complying with ECRA. Accordingly, FWI will be receiving the full benefit of any expenditures which are necessary to

allow the transfer to go forward." This disingenuous argument rests on the premise that the Trustee cannot turnover the collateral without ECRA compliance. As that premise is at the crux of this Opinion, and has not yet been decided by this Court, a conclusion based on the premise does not demonstrate the benefit required under Sec. 506(c).

■ Mere conclusory allegations of the requisite benefit are insufficient to warranty court authorization of the use of a secured creditor's collateral under § 506(c). *Fazio, supra.; Roggio, supra.* Courts are divided, however, on the issue of exactly what constitutes a "benefit" for 506(c) purposes. In *In re Flagstaff Foodservice Corp.,* 762 F.2d 10 (2d Cir.1985), the Court required the debtor to "show that its funds were expended primarily for the benefit of the creditor and that the creditor directly benefitted from the expenditure." *Id.* at 12. In contrast, the Court in *In re McKeesport Steel Castings Co.,* 799 F.2d 91 (3d Cir.1986), adopted a much more expansive formula for determining benefit. There, the court stated that: "The definition of benefit encompasses more than the bottom line of a balance sheet. Preservation of a going concern value of a business can constitute a benefit to the secured creditor." *Id.* at 94, quoting *In re Afco Enterprises,* 35 B.R. 512 (Bkrtcy.D.Utah 1983).

■ The Court holds that even under the broad view urged by the *McKeesport* Court, Laura Associates has failed to make the requisite showing of benefit to FWI under § 506(c). In light of the fact that FWI has no interest in the real estate which is subject to the ECRA procedures, and the fact that its collateral is wholly unrelated to the Denville property, the Court finds that FWI would not benefit from the use of its collateral to fund the cost of ECRA compliance.

---

5. *See contra, In re Wall Tube & Metal Products Co.,* 831 F.2d 118 (6th Cir.1987) wherein the Court, although failing to expressly state that § 959(b) applied, noted, "In either [liquidating or reorganizing], an environmental hazard on the estate's property is within the control of the trustee." However, in *Wall Tube,* unlike the matter *sub judice,* the subject property was owned by the debtor and contained identified hazardous substances. *See* discussion at p. 235, *supra.*

## IV. ADMINISTRATIVE PRIORITY UNDER § 503(b)(1)(a)

The Trustee, in his moving papers, urges the Court to find that, even if the Court deems the costs of compliance to be administration expenses, these expenses do not take priority over the secured claim of FWI.[6]

The Trustee cites as support for its position the case of *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (Bkrtcy.1985). In *T.P. Long*, the *Environmental Protection Agency* ("EPA"), sought as an administrative expense the cost of removal of hazardous material from the debtor's business facility. The Court allowed the costs as an administrative expense, but refused to allow the expense to prime the secured claim of a bank upon the proceeds of the subject property. Thus, the secured creditor was entitled to the proceeds of sale without mitigation for the costs incurred by the EPA. The Trustee also relies for its position on *In re Paris Industries*, 80 B.R. 2 (Bkrtcy.D.Me.1987), in which the Court, in accord with *T.P. Long, supra*, rejected the argument of the State of New York that the cost of an environmental cleanup should be awarded a "superpriority" over the claim of a secured creditor. In that regard, the Court noted: "[the secured creditor] has suffered extensive losses on its loans to the debtors. The court will not, in the absence of legislation or other authority, add to these losses by making ... [the secured creditor] an insurer of all risks caused by its collateral." *Id.* at 5.[7]

Additionally, the Trustee calls the Court's attention to several cases which deal with a potential claim of a landlord for environmental cleanup expenses. In the case of *In re Dant & Russell*, 853 F.2d 700 (9th Cir.1988), the Court of Appeals held that a landlord's claim for potential cleanup expenses incurred as a result of the debtor's activities would be simply a general unsecured claim. The Court, relying on the decisions in *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) and *Southern Railway Co. v. Johnson Bronze Co.*, 758 F.2d 137 (1985), declined to grant an administrative priority to a landlord for his potential cleanup expenses.

The Court notes that under these cases, even if it were inclined to grant administrative status for cleanup costs, these claims would be general unsecured claims and would not take priority over the secured claim of FWI. Since the secured claim alone is larger than the assets of the estate, there would be no possible recovery of expenses on a general unsecured claim.

## V. FWI AS "OPERATOR" UNDER N.J.S.A. 13:1 K–9

■ In the alternative to trustee liability for ECRA, Laura urges the Court to find that FWI was an "operator" of the Denville manufacturing facility and thus jointly liable with Laura for ECRA compliance.[8] ECRA does not define "operator." However, the New Jersey Spill Act, a sister act to ECRA, defines an operator as "any per-

---

**6.** In a Letter Memorandum to the Court dated 9/9/88, Laura Associates asserts that the costs of ECRA compliance take priority over FWI's lien, based on language in a Financing Order issued by the Court on April 24, 1985, which grants the secured party a first priority lien in all of the debtor's assets "subject only to now existing and valid and perfected liens ... and reasonable administration expenses incurred by professionals pursuant to Section 327 and 330 of the Bankruptcy Code." This assertion fails to recognize that the stated language covers only administration expenses which have been authorized by the Trustee, not those which are urged upon the Trustee by third parties.

**7.** This proposition is also supported by Prof. Collier in *Collier on Bankruptcy*, 15th Ed. (1986) wherein it is stated: "Presumably ... [*Midlan-*

*tic* ] makes all assets, *at least free assets*, liable for clean-up costs, giving state authorities a superpriority. *This priority which is not a lien should not, however, extend to prime an existing lien on property of the estate."* [Emphasis added]. *Id.* at § 554.02.

**8.** The New Jersey Administrative Code provides, in relevant part:
7:26B–1.7—Liability for ECRA compliance
  (a) Notwithstanding the provisions of N.J.A.C. 7:26B–3.3 and 7:26B–5.5(d), both the owner and operator of the industrial establishment shall be strictly liable without regard to fault, jointly and severally, for compliance with the Act and this chapter except as provided in (b) below.
Subsection (b), which is inapplicable here, deals with hostile tender offers.

son in control of, or having responsibility for, the daily operation of a facility." N.J. S.A. 58:10A–22(i).

The landlord submits that the involvement of Gerry Mecca, the principal of FWI with the Debtor, rises to the level of responsibility for daily operations. As support for its allegation, Laura offers the following facts:

(1) John Mazzanti ("Mazzanti") and Gerry Mecca have known each other for approximately 20 years.

(2) Mazzanti served as financial advisor to FWI in connection with the financing agreement with the Debtor.

(3) Approximately three months subsequent to the filing of the Chapter 11 petition, John Mazzanti was hired by the Debtor as general manager of Corona Plastics.

(4) Since becoming employed by Corona Plastics, John Mazzanti has spoken with Gerry Mecca on a nearly daily basis regarding the financial condition of the Debtor and the need for additional financing.

(5) Michael Cimilluca ("Cimilluca"), CPA, became employed by the Debtor in its finance and accounting department following the Chapter 11 filing. Cimilluca was known by Mecca and Mazzanti prior to his employment with the Debtor.

(6) Mecca, through FWI, has guaranteed payment to various suppliers of the Debtor.

Laura alleges that these facts are tantamount to FWI controlling the daily operations of the Debtor. The Court, after careful review of all moving papers and after taking two days of testimony on this issue, must disagree. Two facts inform the Court's judgment. First, given the size of the secured creditor's claim (approximately $8.3 million), the Court does not find it unusual that the secured creditor desires to be kept informed of the financial status of the Debtor. There has been no evidence proffered that demonstrates that Mecca was involved in the actual business operations of the Debtor, e.g., manufacturing or marketing decisions, or hiring and firing decisions. Second, the Court takes note of

the fact that the Trustee, Jack Birnberg, has been controlling the business operations of the Debtor since 1985 and has not alleged that Mr. Mecca was attempting to control the operations.

Thus, the Court finds that FWI is not an "operator" and is therefore not responsible under N.J.S.A. 13:1 K–9.

In conclusion, the Court finds that neither the Trustee nor the secured creditor is responsible for ECRA compliance, and that any potential costs of compliance do not take priority over the secured claim of FWI. Accordingly, the Court will grant the motion of FWI seeking turnover of its collateral and will also approve the Trustee's request that it may turnover the collateral without first complying with ECRA.

Submit the appropriate Order within ten (10) days of the date hereof.