**In re N.P. MINING CO., Debtor.**

**Bankruptcy No. 87–01107.**

United States Bankruptcy Court,
N.D. Alabama, W.D.

Nov. 20, 1990.

David A. Larsen, Birmingham, Ala., for debtor, defendant.

Milton McCarthy, Jasper, Ala., for plaintiff.

C. Michael Stilson, Tuscaloosa, Ala., Chapter 7 Trustee.

Ronald L. Davis, Tuscaloosa, Ala., for Chapter 7 Trustee.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This case came before the Court on the Alabama Surface Mining Commission's motion for payment of civil environmental penalties as 11 U.S.C. § 503(b)(1)(A) actual, necessary costs and expenses of preserving the estate. The Commission is the enforcer for state reclamation law for surface mines. The context of this decision is a Motion for Summary Judgment on the issue of the priority expense claim filed by the Commission. Additionally, the Commission objected to submission of briefs and affidavits by the Chapter 7 Trustee and the Debtor on the day of hearing on the Motion for Summary Judgment.

The Commission's Motion for Payment of an Administrative Expense under 11 U.S.C. § 503(b)(1)(A) and its attendant Motion for Summary Judgment is due to be DENIED, there being no disputed fact material to the legal issue. Additionally, briefs and affidavits filed by non-moving parties on the date of the hearing were considered as timely since they were filed as authorized under Fed.R.Civ.P. 56(c) and 6(d) and their bankruptcy counterparts Bankruptcy Rules 7056(c) and 9006(d). This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

On February 6, 1987, N.P. Mining Company, a privately owned corporation engaged in leasing, mining and selling coal, filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. The Debtor company continued to operate the mining facilities after relief was granted. However, on June 15, 1988, after pressures were exerted by creditors, a Chapter 11 Trustee was appointed.

The Trustee took control of the remnants of the business and served until April 14, 1989, when the case was converted to a Chapter 7 liquidation proceeding and a new Chapter 7 Trustee was appointed. The case was also transferred from Bankruptcy Court in Birmingham to this Court in Tuscaloosa at that point. During the more than two-year pendency of the Chapter 11 reorganization of this business, no plan of reorganization proposed by either creditors or debtor was ever implemented.

The Debtor company had operated six wholly-owned subsidiaries which conducted its operations in the Warrior Coal Field of Alabama. Land on which the coal was mined was leased by the Debtor, and all equipment used in the mining and shipment of the coal was owned by the Debtor. N.P. Mining contracted with its subsidiary corporations to excavate and remove the coal from the leased property, with equipment leased from N.P. Mining. The Debtor corporation took possession of the coal once it was mined, sold it and then paid its subsidiaries their costs of mining from the sale proceeds.

N.P. Mining Company was a licensed and permitted surface coal mine operator under the state Surface Mining Control and Reclamation Act of 1981 (hereinafter the Reclamation Act), *Ala. Code* §§ 9–16–70 et seq. (1975).

The Alabama Surface Mining Commission, administrator and enforcer of the above laws, had cited the mining operation for a wide variety of environmental violations, usually in the form of Notices of Violation. In many instances, the state agency issued Cessation Orders against the company.

When the Debtor–in–Possession was still in control of N.P. Mining during the Chapter 11 proceedings, the Debtor on May 23, 1988, filed an adversary proceeding against the Commission in an attempt to enjoin the state agency from citing N.P. Mining for such violations. Cumulatively, the $2,349,-100 the Commission seeks is the result of those mounting citations. The Debtor contended in its complaint that such state action was a violation of the automatic stay of 11 U.S.C. § 362(a). The Commission denied the allegation, contending its action came under an exception to the stay provided in 11 U.S.C. § 362(b)(4).

That request for injunctive relief was still pending in the Birmingham Bankruptcy Court when attorney Andre Toffel was appointed Chapter 11 Trustee in June of 1988. Toffel, testifying at an October 31, 1989 hearing at Tuscaloosa, described N.P. Mining Company as mired in severe financial problems, with massive debts and no cash to make payrolls, when he took over.

Toffel testified that Bankruptcy Judge Stephen Coleman's order appointing him trustee also limited his activities to doing little more than receiving and preserving for the estate the proceeds of a $122,000 check from Scott Paper Company on a coal contract. Toffel testified that Judge Coleman was aware of the mounting number of citations from the Commission. He said that he neither corrected the violations cited, (other than what could be done by N.P. Mining employee, Bill Kennedy) appealed the citations, nor paid the penalties because of the limits placed on him by Judge Coleman and the lack of funds in the bankruptcy estate.

On April 3, 1989, just before the case was converted from Chapter 11 to Chapter 7, the Alabama Surface Mining Commission filed a Motion for Administrative Expenses in the Chapter 11 case. That motion sought administrative priority for $2,349,-100 in civil penalties stemming from violations of the Alabama Surface Mining Act and the Alabama Surface Mining Commission's Rules and Regulations.

Penalties were assessed to the Debtor between February 6, 1987, (date of filing of the Chapter 11 case) and April 14, 1989 (the date of the case's conversion to Chapter 7). It is uncontroverted that the monies sought by the Alabama Surface Mining Commission as administrative expenses are for civil penalties and not for any actual pecuniary loss suffered by or expenses incurred by the Alabama Surface Mining Commission. The total is unrelated to cost of correction of any violation.

It is also undisputed that all active mining operations had ceased by the appointment of the Chapter 11 Trustee on June 15, 1988. Only 20 of the penalties were assessed and issued against N.P. Mining before the trustee's appointment—for a total of $399,700, according to documents in the case.

The Commission continued to cite the Debtor for environmental violations, eventually declaring N.P. Mining Company's reclamation bonds forfeited. Such non-cancellable bonds are required by the Commission to insure that environmental damage caused by mining operations will be repaired if the permittee fails to reclaim the land.

However, the bonding company had involved the Commission in state court litigation in an attempt to avoid funding the reclamation. American Resources Insurance Company, Inc. had alleged that the failure of the Commission to take more timely action against the permittee had prejudiced its position. The suit was filed first in Tuscaloosa County Circuit Court, and had been transferred to Walker County by the hearing in this case.

(On January 24, 1990, this Court approved payment of premiums due American Resources Insurance Company, Inc. to the extent they reflected premiums due for bonds accruing during the period any mines of the Debtor actually operated under Chapter 11. Such payments were determined by the Court to be Chapter 11 administrative expenses. However, the Court specifically denied the company administrative expenses as part of Chapter 7 administration.)

On August 23, 1989, a hearing was held on the Alabama Surface Mining Commission's Motion for Administrative Expenses. September 5, 1989, the Commission filed a Motion for a Summary Judgment on the expenses based on pleadings, its reply brief and brief in support of summary judgment and affidavits filed in the case.

Additional briefs in opposition to allowing payment of the penalties as administrative expenses were filed on behalf of the Chapter 7 Trustee and on behalf of N.P. Mining Company. In connection with the N.P. Mining memorandum, an affidavit by Nancy Weinard, vice president, secretary and office manager for N.P. Mining from November of 1982, until appointment of the Chapter 11 Trustee was also filed. Counsel for the Chapter 7 Trustee filed an affidavit (included elsewhere in the record of this bankruptcy case) by Toffel as Chapter 11 Trustee requesting that the case be converted to Chapter 7. These materials were filed with the Court October 31, 1989, the day of the hearing on the Commission's Motion for Summary Judgment.

Ms. Weinard's affidavit contended that most of the penalties were actually based on pre-petition disturbances to the land and/or attached to pits that had not been mined since September of 1984. Ms. Weinard's affidavit contended that a total $296,850 of the $399,700 in pre-June 15, 1988, penalties were actually based in pre-petition mining activities.

Counsel for the Commission objected to the Court's consideration of the briefs and affidavits in making this determination, contending they were not timely under Fed. R.Civ.P. 56(c) and 6(d) and their counterparts, Bankruptcy Rules 7056(c) and 9006(d). Counsel for the Chapter 7 Trustee said at the hearing that he though he had been granted oral permission by the Court to submit materials the day of the hearing.

I.

THE COURT HAD DISCRETION ON PROPER SHOWING TO ADMIT MATERIALS ON DAY OF HEARING.

■ Rule 56(c) of the Federal Rules of Civil Procedure dealing with summary judgment (and Bankruptcy Rule 7056) pro-

vides that "[t]he adverse party *prior to the day of hearing* may serve opposing affidavits." [1] However, Fed.R.Civ.P. 6(d) (and Bankruptcy Rule 9006(d)) invests the Court with the power to permit opposing affidavits "to be served at some other time." [2]

As the predecessor for the Court of Appeals for the Eleventh Circuit noted in *Beaufort Concrete Co. v. Atlantic States Construction Co.*, 352 F.2d 460 (5th Cir. 1965), *cert. denied* 384 U.S. 1004, 86 S.Ct. 1908, 16 L.Ed.2d 1018 (1966), since Rule 56 contains no "unless" clause, it can be argued it provides no exception. However, that reading does not comport with the general construction directive of Fed.R. Civ.P. 1: "They (the Rules) shall be construed to secure the just, speedy, and inexpensive determination of every action." *Beaufort Concrete* stood for that liberal interpretation of these rules:

But this reading does not comport with the liberal tenor of the Federal Rules, and is not justified for any singularity of the motion for summary judgment. "Rule 6(b) is a rule of general application giving wide discretion to the Court." Advisory Committee's Note to Amendment to Rule 6.

*Beaufort Concrete* at 462.

Federal Rule 6(b) and Bankruptcy Rule 9006(b) provide for enlargement of fixed time frames by the court for cause shown—even without a motion if the request is made prior to the expiration of the time frame or after expiration if the failure is the result of "excusable neglect." [3] The broad discretion given the Court under these rules was re-emphasized in the more recent *Clinkscales v. Chevron, U.S.A., Inc.*, 831 F.2d 1565 (11th Cir.1987).

In the N.P. Mining Company case, counsel for parties opposing the Commission's motion for summary judgment, misunderstood a communication with the Court the week prior to hearing. Counsel for non-movants expressed agreement for the movant to file any additional briefs and affidavits after the hearing of October 31, 1989. The Commission took advantage of that opportunity before the Court took this matter under submission as of November 13, 1989.

Therefore, in keeping with the proper construction of the Federal and Bankruptcy Rules and concurrently in the interest of justice, the Court has considered all the evidence, testamentary and documentary, submitted by either side in this case by November 13, 1989.

---

1. Bankruptcy Rule 7056(c) reads:
   **(c) Motion and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

2. Bankruptcy Rule 9006(d) provides:
   **(d) For Motions—Affidavits.** A written motion, other than one which may be heard ex parte, and notice of any hearing shall be served not later than five days before the time specified for such hearing, unless a different period is fixed by these rules or by order of the Court. Such an order may for cause shown be made on ex parte application.

When a motion is supported by affidavit, the affidavit shall be served with the motion; and except as otherwise provided in Rule 9023, opposing affidavits may be served not later than one day before the hearing, unless the court permits them to be served at some other time.

3. Bankruptcy Rule 9006(b)(1) provides:
   **(b) Enlargement.**
   **(1) In General.** Except as provided in paragraphs (2) and (3) of this subdivision, when an act required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

## II.

### THE CIVIL ENVIRONMENTAL PENALTIES SOUGHT BY THE COMMISSION ARE NOT ACTUAL AND NECESSARY EXPENSES OF PRESERVING THE CHAPTER 11 ESTATE.

■ 11 U.S.C. § 503(b)(1)(A) provides that:

(b) After notice and hearing, there shall be allowed administrative expenses, other than claims allowed under Section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case: (underlining for emphasis)

In the N.P. Mining case, the Court is being asked to grant civil penalties, computed on a mechanical formula based in the Alabama Code, and having no relation to any cleanup or reclamation costs, priority as Section 503(b)(1)(A) administrative expenses. Such status would place the State ahead in line of others who have unsecured claims against N.P. Mining Company's remaining assets.

### A. ONLY ACTUAL, NECESSARY COSTS AND EXPENSES OF PRESERVING THE ESTATE ARE ALLOWED AS ADMINISTRATIVE EXPENSES.

To acquire such status, the Commission must demonstrate that the costs it seeks, just as the Code provides, are necessary and actual costs and expenses of preserving the estate. The Commission has failed its burden of proof in this respect.

To begin with, only 20 of these penalties were issued for the period before the Trustee in the Chapter 11 case was appointed on June 15, 1988—after which all mining operations were shut down. Additionally, an affidavit indicates and the Alabama Surface Mining Commission's counsel has conceded that some of the violations had their roots in prepetition violations. (Penalties were actually assessed after the Chapter 11 petition was filed in 1987 and before it was converted to Chapter 7 in 1989.) The record also reflects one affidavit alleging that some penalties were issued for violations in a mining pit idled by a strike as early as 1984.

Even assuming that these "violations" were all post-Chapter 11 petition and pre-Chapter 7 conversion, there are still problems with considering the civil penalties they produced as actual, necessary expenses of preserving the Chapter 11 bankruptcy estate.

1. The civil penalties do not represent any actual expense.

The total $2,349,100 sought does not represent any actual cost. It represents no estimate of reclamation or any other operating/capital expenditure of this Debtor's coal mining and coal brokering business. It represents no real cost of the Chapter 11 Trustee's management of that business or gathering of its assets. It reflects no actual cost or expenditure of the State of Alabama in connection with these violations. That is conceded by the Commission. The monetary civil penalties sought are solely punitive.

There is no specific authorization in the Bankruptcy Code for allowing such as an administrative expense. 11 U.S.C. § 503(b)(1)(C) says that tax penalties will be allowed as administrative expenses, but these assessments are not tax penalties.

2. Payment was not necessary to the preservation of the estate.

However one views the policy imperatives behind enforcement of state environmental law, correction of these violations was not necessary to the preservation of this bankruptcy state or the operation of this coal mining business. Enforcement of environmental law by the state is a separate issue from that of which claimant gains a priority slot ahead of others in a bankruptcy case. The two issues have generally intersected in the bankruptcy context only when 1) the environmental law violation involved an immediate danger to the public health and safety; and 2) when the administrative expense sought for the vio-

lation were for or related to actual expense of cleanup.[4]

The parties in the N.P. Mining case have agreed that the funds sought by the Commission are solely in the nature of civil penalties imposed as punishment and have nothing to do with costs of any kind. Nor has the Commission made any allegation that the violations involve hazardous materials or conditions that need immediate remedy. Thus the N.P. Mining case is very much distinguishable on the facts from the main cases considering these issues. It is also interesting that even where a state or other entity sought an administrative expense was for actual cost of eliminating an immediate danger to the public, some courts have refused to pay such expense out of the resources of the bankruptcy estate.[5]

When the Debtor–in–Possession controlled N.P. Mining and the mining operations were still ongoing, the Debtor–in–Possession sought to have the Bankruptcy Court halt the Commission's enforcement actions by injunction as a violation of the automatic stay.

Then, when Toffel was appointed Chapter 11 Trustee, the floundering company was no longer mining coal. Its resources were severely limited. The Bankruptcy Court then authorized expenditure for some environmental work by an N.P. employee on the leased premises, but the Court did not approve any further payments from the bankruptcy estate. Therefore payment of $2,349,100 in cumulative fines cannot be considered a necessary expense of this company's operation.

3. By the point the Commission filed its motion, payment would have depleted, rather than preserved, the estate.

Former Chapter 11 Trustee Toffel told the Court that his mission as Trustee in N.P. Mining Company's last year before its conversion to Chapter 7 liquidation was to collect a $122,000 check from Scott Paper Co. and to spend as little as possible.

Toffel testified in the hearing on this matter that Judge Coleman approved use of an N.P. Mining Company employee to work on the environmental violations and to deal with the Commission. But although the Court was aware of the mounting citations coming from the commission, Toffel said there was no direction to pay such at the expense of other claimants.

Consequently, there can be no issue of negligence on the part of Toffel such as gave rise to payment of fire damage claims

4. In the following cases, the environmental law problem involved a danger to public health and safety and the administrative expenses sought were actual costs of remedying the danger: *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); *United States Department of the Interior v. Elliott,* 761 F.2d 168 (4th Cir.1985); *Southern Railway Co. v. Johnson Bronze Co.,* 758 F.2d 137 (3rd Cir.1985); *In re Wall Tube & Metal Products Co.,* 831 F.2d 118 (6th Cir.1987); *In re Smith–Douglass, Inc.,* 856 F.2d 12 (4th Cir.1988); *In re Dant,* 853 F.2d 700 (9th Cir.1988); *In re Vermont Real Estate Investment Trust,* 25 B.R. 804 (Bkrtcy.D.Vt.1982); *In re Borne Chemical Co., Inc.,* 54 B.R. 126 (Bkrtcy.D.N.J.1984); *In re T.P. Long Chemical, Inc.,* 45 B.R. 278 (Bkrtcy.N.D.Ohio 1985); *United States v. Ilco, Inc.,* 48 B.R. 1016 (Bkrtcy.D.C.1985); *In re Franklin Signal Corp.,* 65 B.R. 268 (Bkrtcy.D.Minn.1986); *In re Mowbray Engineering,* 67 B.R. 34 (Bkrtcy.M.D.Ala.1986); *In re Stevens,* 68 B.R. 774 (Bkrtcy.D.Me.1987); *In re Peerless Plating Co.,* 70 B.R. 943 (Bkrtcy.W.D.Mich.1987); *In re Paris Industries,* 80 B.R. 2 (Bkrtcy.D.Me.1987); *In re Brio Refining Co.,* 86 B.R. 487 (Bkrtcy.N.D.Tex.1988); *In re Corona Plastics,* 99 B.R. 231, (Bkrtcy.D.N.J. 1989); *In re FCX, Inc.,* 96 B.R. 49 (Bkrtcy.E.D.N. C.1989); *In re Microfab, Inc.,* 105 B.R. 161 (Bkrtcy.D.Mass.1989).

5. Courts in the following cases indicated that costs of environmental cleanup of situations threatening to the public health need not come out of the resources of a bankruptcy estate to the detriment of other creditors: *Southern Railway Co. v. Johnson Bronze Co.,* 758 F.2d 137 (3rd Cir.1985); *In re Dant,* 853 F.2d 700 (9th Cir.1988); *In re Smith–Douglass, Inc.,* 856 F.2d 12 (4th Cir.1988); *Matter of Borne Chemical, Co., Inc.,* 54 B.R. 126 (Bkrtcy.D.N.J.1984); *In re Franklin Signal Corp.,* 65 B.R. 268 (Bkrtcy.D. Minn.1986); *In re Paris Industries,* 80 B.R. 2 (Bkrtcy.D.Me.1987); *In re Brio Refining Co.,* 86 B.R. 487 (Bkrtcy.N.D.Tex.1988); *In re FCX, Inc.,* 96 B.R. 49 (Bkrtcy.E.D.N.C.1989); *In re Corona Plastics,* 99 B.R. 231 (Bkrtcy.D.N.J.1989); and *In re Microfab, Inc.,* 105 B.R. 161 (Bkrtcy.D.Mass. 1989).

as a Chapter 11 administrative expense in *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). The Chapter 11 Trustee was implementing the order of the Bankruptcy Court.

4. Premiums for the insurance company bonding the mining operations during their active phase were approved as administrative expenses.

This court has approved payment of a priority administrative expense for the premiums due American Resources for the reclamation bonds it provided for N.P. Mining—while the company was in Chapter 11 and while the company was still operating. Counsel for the Commission pointed out that such bonds are non-cancellable.

They are non-cancellable for the very policy reasons exemplified by this case. State law requires such bonds so that when a mining operation cannot or will not reclaim an area it has mined, the normal damage that surface mining inflicts will be corrected at no cost to state taxpayers. It may be, as the record of this case would seem to indicate, that this safeguard/remedy is not sufficient to protect the interests of the taxpayers of Alabama.

If that is so, however, the Commission should look to the State Legislature for a solution rather than the administrative expense provisions of the Bankruptcy Code.

B. SO FAR, ONLY ONE CASE HAS ALLOWED A § 503(b)(1)(A) ADMINISTRATIVE EXPENSE PRIORITY FOR ENVIRONMENTAL *PENALTIES.*

1. The logic of the Fourth Circuit's Elliott case is inapposite in this situation.

The Alabama Surface Mining Commission has asked this Court to adopt the logic of *United States Department of the Interior v. Elliott*, 761 F.2d 168 (4th Cir.1985), and to approve the Commission's $2,349,100 in post-petition civil penalties as a pri-

ority administrative expense. Both sides to this dispute are on record as citing this as the only case so holding. Though there has been much case law on environmental violations, no case is closely similar to the dilemma in N.P. Mining Company.

In *Elliott*, the Court of Appeals of the Fourth Circuit, put the onus on the creditors for insuring that a debtor-in-possession or trustee in a Chapter 11 case complied with applicable environmental regulations. The case was decided under the old Bankruptcy Code and expanded the interpretation of old Section 57(j) (which had allowed administrative expense status to tax penalties) to *all* post-petition penalties.

The case involved post-petition penalties for violations of federal surface mining law, the model for the Alabama statute, by a Chapter 11 debtor in possession. The violations and civil penalties were for infractions while the company was actually mining coal.

The case distinguished between responsibility for the violations pre and post-petition:

> Penalties incurred by the debtor before the filing of the bankruptcy petition should not reduce the distribution to which the creditors are entitled, because the creditors could not prevent the accrual of the penalties.

> On the other hand, once the bankruptcy petition has been filed, the creditors can prevent the accrual of penalties. They, therefore, cannot by their inaction allow the debtor to incur penalties while operating the business, perhaps benefiting the profitability of the business, and yet object to the allowance of post-petition penalty claims. In effect, once the petition is filed, the creditors lose their "innocent" status.

*Elliott* at 171.

*Elliott* is inapposite to the N.P. Mining Company case for several reasons. First, Section 503(b)(1)(B) and (C)[6] which replaced

---

6. 11 U.S.C. § 503(b)(1)(B) and (C) provides:
(b) After notice and a hearing, there shall be allowed administrative expenses, other than

claims allowed under section 502(f) of this title, including—
(1)(B) any tax—

the old code section rather clearly provide administrative expense only for tax penalties, leaving the Section 503(b)(1)(A) actual, necessary cost of preserving the estate the only possible priority for environmental assessments. Second, it would be unjust to do as *Elliott* did and make N.P. Mining's other creditors the unwilling underwriters of the company's environmental risk while in Chapter 11.

After all, the Court has already approved an administrative expense to an insurance company for insuring against that risk of loss. It is from the insurance company that the Commission should seek its reclamation cost. Additionally, granting an administrative expense would actually defeat the punitive/retributive policy goal behind the fines. Punishing the creditors of a miner who violated surface mining law will not deter other coal miners from violating the law in future.

Consequently, the Court must reject the Commission's request that the *Elliott* view of who should underwrite risk of environmental damage be adopted for the Western Division, Northern District of Alabama.

## C. THE UNITED STATES SUPREME COURT HAS NOT ADDRESSED THIS SPECIFIC ISSUE YET.

Two major and much cited United States Supreme Court decisions have dealt with environmental issues in the bankruptcy context. But neither give much guidance in examining the equities of the N.P. Mining Company situation.

1. The Midlantic case does not control since abandonment is not an issue, since the penalties sought are not compensatory and since no immediate danger to public safety has been cited.

In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title; or

(ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to

L.Ed.2d 859 (1986), the Court found that a Chapter 7 trustee (in a case converted from Chapter 11) could not abandon property found to be contaminated with PCBs because of the cost of cleanup to the estate. The Court said at 474 U.S. at 502, 106 S.Ct. at 760: "Neither the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety."

If *Midlantic* provides any signposts for navigating the interplay of the Bankruptcy Code and state environmental law it may be found in the following language:

In light of the Bankruptcy trustee's restricted pre–1978 abandonment power and the limited scope of other Bankruptcy Code provisions, we conclude that Congress did not intend for Sec. 554(a) to pre-empt all state and local laws. The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety. Accordingly, without reaching the question whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself, we hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards. (This holding was explained further in note 9:

9. This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety

which such adjustment relates ended before or after the commencement of the case; and

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph;

from <u>imminent and identifiable harm.</u> (underlining for emphasis).

*Midlantic* at 506–07, note 9, 106 S.Ct. at 762, note 9.

There is no abandonment issue in the N.P. Mining case—since the company's leases have all either expired or been assigned. N.P. Mining never had legal title to the land where these environmental violations are alleged to have occurred. If, as the Commission's counsel implied in testimony, a hazard such as an exposed high wall might exist on these lands, the state would also have recourse against the lessor and title holder.

The Supreme Court in *Midlantic* held generally that 28 U.S.C. § 959(b) supported the conclusion that "Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of the trustee's powers." *Midlantic* at 505, 106 S.Ct. at 761. Section 959(b) requires a bankruptcy trustee to "manage and operate the property in his possession ... according to the requirements of the valid laws of the State."

The N.P. Mining Chapter 7 Trustee contends, with merit, that since the Chapter 11 Trustee never operated or managed a surface mining business—merely a coal brokering operation—that Section 959(b) cannot require compliance with the regulations for operations.

Additionally, in *Midlantic*, the Supreme Court reserved the question of whether environmental *cleanup* costs are to be given priority. 474 U.S. at 507, 106 S.Ct. at 762. Consequently, even if the costs sought by the Commission were actual expenses of any kind, *Midlantic* would not control.

2. The Kovacs case does not control since penalties are post-petition, since dischargeability is not an issue and since there is no allegation the violations cause an immediate danger to public health.

Likewise, the often-cited *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) has only peripheral relevance to the N.P. Mining Company problem. The rele-

vance comes on the philosophical priority the Supreme Court placed on the debtor's fresh start under the Bankruptcy Code as opposed to reimbursing the state for its expenses of environmental cleanup. Additionally, the case involved an assertion of an administrative expense priority (by a lessor) for hazardous waste cleanup costs on property not owned by the bankruptcy estate.

In that case, the Supreme Court held that expenses of compliance with a pre-petition state court injunction requiring environmental cleanup were dischargeable in bankruptcy. Kovacs, chief executive officer and stockholder for Chem–Dyne Corp, originally filed under Chapter 11 of 11 U.S. C.—but subsequently converted the petition to a liquidation under Chapter 7. The company had operated an industrial and hazardous waste disposal site in Hamilton, Ohio.

The Supreme Court held that the state of Ohio's injunction directing the cleanup was no more than a general unsecured claim. The claims asserted against N.P. Mining Company are likewise for violations alleged for land that is not property of the estate, although the civil penalties were assessed after the Chapter 11 petition was filed.

Justice O'Connor's concurrence in *Kovacs* is also of interest because she addresses concern that the majority's opinion will impede states in enforcement of environmental laws. She logically points out that state law has always governed determination of property rights in assets in the bankruptcy estate:

Because "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law," *Butner v. United States*, 440 U.S. 48, 54, 59 L.Ed.2d 136, 99 S.Ct. 914 [918] (1979), the classification of Ohio's interest as either a lien on the property itself, a perfected security interest, or merely an unsecured claim depends on Ohio law. That classification—a question not before us—generally determines the priority of the State's claim to the assets of the estate relative to other creditors. Cf. 11 U.S.C. § 545 [11 U.S.C.S. § 545]

(trustee may avoid statutory liens only in specified circumstances). Thus, a State may protect its interest in the enforcement of its environmental laws by giving cleanup judgments the status of statutory liens or secured claims. (underlining for emphasis)

*Kovacs* at 286, 105 S.Ct. at 711.

Since *Kovacs* dealt with a pre-bankruptcy environmental judgment, it is not on point with the situation in N.P. Mining. But Justice O'Connor's comments illustrate the ways in which state law and federal bankruptcy law must mesh to provide equity for competing interests. It should be remembered that neither the Trustee nor the Debtor are challenging the Alabama Surface Mining Commission's right to assess these civil penalties.

What they are objecting to is the "place in line" the commission seeks for the penalties—a Section 503(b)(1)(A) priority administrative expense. That priority would put this interest ahead of other unsecured claims to resources of the estate.

### D. THE TREND IN RECENT CASE LAW IS TO GIVE CLOSE EXAMINATION TO ATTEMPTS TO USE RESOURCES OF BANKRUPTCY ESTATES FOR ENVIRONMENTAL VIOLATIONS WITHOUT A MIDLANTIC "IMMINENT DANGER" DETERMINATION.

1. Three circuits concluded in varying fact situations that debtors' resources should not be used for environmental problems.

The Fourth Circuit in *In re Smith–Douglass, Inc.*, 856 F.2d 12 (4th Cir.1988) held that a Chapter 11 debtor was appropriately allowed unconditionally to abandon a fertilizer plant although the plant was in violation of Illinois environmental law—where the estate lacked unencumbered assets to finance cleanup and where the facility did not present any imminent harm or danger to the public. The Court performed a *Midlantic* analysis to determine if hazardous waste on the property was an immediate risk to public safety.

Additionally, the Fourth Circuit considered the general financial condition of the bankruptcy estate in making its determination:

The district court, contra to the bankruptcy court's conclusion, held that the financial condition of the debtor is irrelevant to the *Midlantic* analysis. This Court disagrees. Cleaning up environmental violations is properly considered an administrative expense within the meaning of 11 U.S.C. § 507(a)(1). While such expense would be subordinate to secured claims, it would have priority over unsecured claims. Accordingly, where the estate has unencumbered assets, the bankruptcy court should require stricter compliance with state environmental law before abandonment is permitted. Smith–Douglass, however had no unencumbered assets.

*Smith–Douglass* at 17.

Both the bankruptcy court and the district court had found that the Debtor's financial situation was irrelevant, that he should be allowed to abandon the contaminated property regardless of whether he had unencumbered assets. The Fourth Circuit upheld the basic decision but added the financial caveat.

The Ninth Circuit in *In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988) found that a lessor was not entitled to an administrative expense priority for cleanup of toxic waste left on the lessor's property by a Chapter 11 debtor-in-possession. Dant & Russell, Inc. had operated a woodyard on land owned by Burlington Northern Railroad Co. in this case. The railroad sought reimbursement for actual expenses of cleanup. The "massive toxic waste contamination" by the debtor resulted from operations both before and after the Chapter 11 petition. The Ninth Circuit discussed its philosophy in the decision:

Although Burlington Northern asserts that public policy considerations entitle its claims for cleanup costs to administrative expense priority, we acknowledge that Congress alone fixes priorities. 3 *Collier on Bankruptcy* P 507.02, at 507–17, (15th ed. 1987). Courts are not free

to formulate their own rules of super or sub-priorities within a specifically enumerated class. *Id.* As Justice O'Connor noted in her concurrence in *Kovacs:*

> [A] State may protect its interests in the enforcement of its environmental laws by giving cleanup judgments the status of statutory liens or secured claims.

469 U.S. at 286, 105 S.Ct. at 711. But until the Oregon Legislature enacts such protective provision or until Congress amends sections 503 and 507 to give priority claims to cleanup costs, we are without authority to create such a priority.

*Dant & Russell, Inc.* at 709.

In *Southern Railway Co. v. Johnson Bronze Co.,* 758 F.2d 137 (3d Cir.1985), the Third Circuit followed the *Kovacs* case to hold that a railroad's claim against a Chapter 11 debtor-in-possession for environmental costs was not an administrative priority—that it was no more than a general unsecured claim.

In that case, Southern Railway, the lessor; and Perry Machinery Corp., Johnson Bronze's (the debtor-in-possession's) successor in interest, sought the administrative priority for cleanup of hazardous wastes generated by Johnson Bronze's continuing operations. Here, the private entities sought to be subrogated to the rights of South Carolina's state agency for regulating hazardous waste.

"In this case, South Carolina's administrative order had not even been reduced to judgment," the Third Circuit noted. "Thus, the claim to which Southern seeks to be subrogated, a general unsecured claim, (after *Kovacs*) in no way improves its priority." The same could be said of the State of Alabama's administrative assessments of civil penalties against N.P. Mining.

2. The lower courts are also tending to give close examination to requests for use of estate resources for environmental violations.

A Massachusetts bankruptcy court held that a liquidating trustee would not be required to clean a Chapter 7 debtor's industrial site, even though environmental contamination of the site posed significant danger to public health and safety. The Commonwealth of Massachusetts had sought in *In re Microfab,* 105 B.R. 161 (Bkrtcy.D.Mass.1989) to force the trustee to perform the cleanup. The court held the state had not shown that the trustee could reduce the danger of the site—even if all the funds in the estate were spent.

In *In re Corona Plastics, Inc.,* 99 B.R. 231 (D.N.J.1989), the United States District Court held that the trustee in Chapter 11 could turn over real estate collateral to a creditor without first complying with terms of the New Jersey Environmental Cleanup Responsibility Act. The court in this case distinguished *Midlantic,* saying that in *Corona,* no imminent environmental threat existed and that the debtor did not own the land. That is also the situation in N.P. Mining.

*In re FCX, Inc.,* 96 B.R. 49 (Bkrtcy.E.D. N.C.1989) held a Chapter 11 debtor could not abandon property where it had buried five tons of pesticide. However, the court also found that only the costs reasonably required to remove the *Midlantic* immediate threat to public health would be given administrative priority:

> EPA and the State of North Carolina argue that the debtor has "unencumbered" funds form which it could pay all costs required by CERCLA (Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9603). The funds, however, are not entirely unencumbered as they have been committed to the payment of other claims in accordance with the terms of the debtor's confirmed plan. The court has "broad discretion in determining whether to award administrative expense priority," *Dant & Russell, Inc.,* 853 F.2d 700, 707 (9th Cir.1988), and the circumstances of this case are such that <u>only those costs reasonably required to remove the immediate threat</u> will be given cost of administration status. (underlining for emphasis)

*FCX, Inc.* at 55.

In *In re Brio Refining, Inc.,* 86 B.R. 487 (D.N.D.Tex.1988), the United States Dis-

trict Court affirmed a bankruptcy court's refusal to grant administrative priority to parties who had federal liability for a polluted site abandoned by a Chapter 7 debtor. *In re Paris Industries Corp.*, 80 B.R. 2 (Bkrtcy.D.Me.1987) considered the environmental issue from a somewhat different vantage point. The court held that no basis existed to grant the State of New York a super-priority lien for cost of cleaning up hazardous waste on the debtor's real property, so that New York's claim did not displace that of a bank's security interest in proceeds of sale of debtor's personal property.

Abandonment was the issue in *In re Franklin Signal Corp.*, 65 B.R. 268 (Bkrtcy.D.Minn.1986). Here, the court allowed a Chapter 7 liquidating trustee (in a case converted from Chapter 11) to abandon drums full of hazardous waste under certain conditions even though doing so would violate Wisconsin state statutes. The court found that there was an absence of evidence of imminent danger from the drums.

In the N.P. Mining Co. case, the Commission never attempted to prove that the $2,349,100 in civil penalties related to any actual cost, much less that it was sought to cure an imminent danger to public safety. The civil penalty assessments have been described as merely punitive.

E. COURTS HAVE COME TO DIFFERENT RESULTS IF BENEFIT ACCRUES TO THE CHAPTER 11 ESTATE FROM PAYMENT FOR ENVIRONMENTAL VIOLATIONS.

1. Payment for environmental penalties might be a priority administrative expense if they are shown to be "the actual, necessary costs and expenses of preserving the estate."

*Collier on Bankruptcy* (15th ed. 1989), the most respected treatise on bankruptcy law, theorizes that penalties for environmental violations might be considered priority administrative expenses *if* they can be shown to be actual and necessary to the Section 503(b)(1)(A) goal of preserving the estate.[7] So different results have occurred in some cases where the expense sought was for actual costs of remedying an environmental problem which benefitted the operation or enhanced assets of the bankruptcy estate.

A specific benefit dictated the award of administrative expenses in cases including the following: *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 124 (6th Cir. 1987), state received administrative expense priority for response costs under CERCLA; *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976), when third parties are induced to supply goods and services to the debtor-in-possession and when the bankruptcy estate has been benefitted, their claim is offered administrative priority; *United States v. Price*, 577 F.Supp. 1103, 1110 (D.N.J.1983), those seeking administrative expense must incur some expenses before they may properly initiate an action; *In re Distrigas Corp.*, 66 B.R. 382, 386 (Bkrtcy.D.Mass.1986), state would be entitled to first priority expense for environmental cleanup of debtor's otherwise valueless property—to extent cleanup benefitted estate; *In re Vermont Real Estate Investment Trust*, 25 B.R. 804, 806 (Bkrtcy.D.Vt.1982), expense for work ordered and actually performed by city was necessary to preservation of debtor's estate and thus entitled to administrative expense priority; and *In re Stevens*, 68 B.R. 774, 783 (Bkrtcy.D.Me.1987), state was entitled to administrative expense priority for expenses it incurred removing waste from property of the estate. Such results are in agreement with the plain language of the Bankruptcy Code.

---

**7.** 3 L. King, Collier on Bankruptcy P. 503.04 (15th ed. 1989) provides:
  Proper rules of preservation <u>might</u> require approval of outlays for repairs, upkeep, freight, and many other kinds of expenses. Such expenses also <u>may</u> include those necessary to abate violations of state and federal environmental regulations, and fines and penalties resulting from violations of state and federal environmental regulations. (underlining for emphasis)

2. However, payment of N.P. Mining's penalties would have depleted, not benefitted or preserved, the bankruptcy estate.

When the State of Alabama Surface Mining Commission decided to assess these civil penalties, the mining operations of N.P. Mining Co. had long been shut down. By that point, payment would merely have emptied the coffers of the bankruptcy estate without curing any environmental problem left on land which was an asset of N.P. Mining. It certainly would not have "benefitted" or preserved this bankruptcy estate, the only valid purpose for which an administrative expense can be awarded under Section 503(b)(1)(A).

## CONCLUSION

The Court therefore must find that the $2,349,100 in civil penalties sought by the Alabama Surface Mining Commission cannot receive priority as an 11 U.S.C. § 503(b)(1)(A) administrative expense of this bankruptcy estate. Payment of these civil penalties is neither factually nor legally an "actual and necessary cost of preserving the bankruptcy estate" as required by the statute.

Therefore, the Alabama Surface Mining Commission's motion for summary judgment in this matter is due to be denied.

This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. A separate order shall be entered consistent with this opinion.

DONE AND ORDERED.