In re N.P. MINING COMPANY, INC., Debtor.

ALABAMA SURFACE MINING COMMISSION, Plaintiff–Appellant,

v.

N.P. MINING COMPANY, INC., Defendant–Appellee,

C. MICHAEL STILSON, Trustee.

No. 91–7342.

United States Court of Appeals, Eleventh Circuit.

June 23, 1992.

Grady M. McCarthy, Jr., William B. Ware, Jasper, Ala., for plaintiff-appellant.

David A. Larsen, Susan S. Wagner, Berkowitz, Lefkovits, Ison & Kushner, Birmingham, Ala., for Trustee.

Ronald Lee Davis, Ezra Kenneth Aycock, Jr., Rosen, Cook, Sledge, Davis, Carrol, Jones & Adcox, P.A., Tuscaloosa, Ala., for defendant-appellee.

Before KRAVITCH, Circuit Judge, HENDERSON and CLARK *, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

The Alabama Surface Mining Commission ("ASMC" or "Commission") appeals from a decision of the bankruptcy court, affirmed by the district court, holding that under the facts of this case, punitive civil penalties assessed after the debtor filed a voluntary petition for protection under chapter 11 and before the case was converted to chapter 7 liquidation proceedings were not entitled to administrative-expense

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

priority under 11 U.S.C. § 503(b). We reverse, and remand the case for further factfinding by the bankruptcy court consistent with our opinion.

## BACKGROUND

The ASMC is responsible for administering and enforcing the Alabama Surface Mining Control and Reclamation Act ("Alabama SMCRA"), Ala.Code §§ 9–16–70 *et seq.* (1975). Debtor N.P. Mining Co. ("N.P."), licensed under the Alabama SMCRA, was engaged in the business of harvesting and brokering coal gathered by surface mining, which is also known as strip mining.

Surface mining is a practice that is heavily regulated in the State of Alabama. State law requires that a licensed operator purchase noncancelable reclamation bonds that ensure that the land it mines will be environmentally reclaimed even if the company becomes insolvent. This scheme apparently worked here as expected: After N.P. became insolvent, its insurer, American Resources, honored the bonds, paying the State of Alabama more than two million dollars to repair the actual damage done to the land. The actual costs of reclaiming the land are not at issue in this suit.

State law also requires that the ASMC inspect surface mining sites at least once a month and issue citations and fines for environmental violations. In accordance with this law, the Commission cited and fined N.P. for numerous violations of the Alabama SMCRA. These fines are solely punitive; that is, they are completely unrelated to the actual costs of correcting harm to the environment. The amount of the fines is figured based on a formula in the Alabama Code. The fines were assessed both before and after N.P. filed its voluntary petition for protection under chapter 11 of the Bankruptcy Code, but we are here concerned only with those fines assessed postpetition. Because the formula requires that the Commission levy a minimum fine of $750 for each day, up to thirty days, that a violation remains uncorrected, initially small fines for minor infrac-

tions can balloon into large fines. A violation left unabated for thirty days would amount to a minimum of $22,500. In addition, the Commission can find any number of violations, each amounting to a minimum of $22,500 after thirty days, at a given site. N.P. operated several sites, and therefore was subject to numerous fines. Eventually, the postpetition penalties totalled $2,349,000, the great majority of which was assessed when the estate was no longer in a position to abate the violations and thereby avoid the fines. None of the violations at any time constituted a health hazard or an imminent risk to public safety.

The Commission seeks administrative-expense priority for these punitive postpetition penalties under 11 U.S.C. § 503(b). If a claim is accorded administrative-expense priority under section 503(b), that claim is paid in the first level of priority, ahead of, *inter alia,* the unsecured creditors; no other claim is paid until every administrative-expense claim is paid in full. In addressing the question of whether these fines are entitled to this priority, it is helpful to divide the events into three phases: first, N.P.'s operation of the estate as a debtor in possession; second, the chapter 11 trustee's administration of the estate; and third, the liquidation of the estate under chapter 7.

### A. *Debtor in Possession*

On February 6, 1987, N.P. filed a voluntary petition for relief under chapter 11 in the bankruptcy court in Birmingham. N.P.'s management continued to operate the company as a debtor in possession, and the mining operations continued. At a certain point, N.P. was no longer able to harvest coal of a quality high enough to meet its contractual obligations to supply coal to the Scott Paper Company, but it managed to keep the contract alive by brokering another company's coal at a profit. Meanwhile, N.P. brought an adversary proceeding against the ASMC seeking to stop it from levying fines without the approval of the bankruptcy court. The court never ruled on this claim.

According to findings made by the bankruptcy court,[1] during the time that N.P. operated as a debtor in possession, the ASMC assessed the estate $399,700 in fines. Appellees contend that $296,850 of this figure was based on prepetition disturbances to the land, leaving—according to appellees—only $102,850 in penalties attributable to postpetition violations by the debtor in possession. The bankruptcy court, however, did not make a factual finding with regard to these figures, merely noting the contentions made in the affidavit of an N.P. vice president.

### B. *Chapter 11 Trustee*

On June 15, 1988, the Birmingham bankruptcy court appointed a chapter 11 trustee. At this point, N.P.'s mining operations ceased completely. According to the bankruptcy court opinion, the chapter 11 trustee testified that:

> [the] order appointing him trustee also limited his activities to doing little more than receiving and preserving for the estate the proceeds of a $122,000 check from Scott Paper Company on a coal contract. [The chapter 11 trustee] testified that Judge Coleman [the Birmingham bankruptcy judge] was aware of the mounting number of citations from the Commission. He said that he neither corrected the violations cited[ ] (other than what could be done by N.P. Mining employee[ ] Bill Kennedy)[,] appealed the citations, nor paid the penalties because of the limits placed on him by Judge Coleman and the lack of funds in the bankruptcy estate.

*Alabama Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining),* 124 B.R. 846, 847 (Bankr.N.D.Ala.1990). The trustee also engaged in coal brokering to keep the Scott Paper Company contract alive. Judge Coleman did, however, allow as a priority administrative expense the payment of premiums due American Resources for the reclamation bonds that ensured that

the actual costs of environmental cleanup would be covered.

The bankruptcy court found that during this time, after the mining operations had ceased and while the chapter 11 trustee was administering the estate, the ASMC assessed the estate $1,949,400 in fines. On April 3, 1989, the ASMC filed a Proof of Claim together with a Motion for Payment of Administrative Expense with the bankruptcy court, seeking administrative-expense priority for these fines.

### C. *Chapter 7 Liquidation*

On April 14, 1989, the case was converted to chapter 7 liquidation proceedings and was transferred from Birmingham to the Tuscaloosa bankruptcy court. Presently, there appears to be between $400,000 to $500,000 in assets remaining in the estate. The ASMC is seeking administrative-expense priority for fines totalling $2,349,000.

N.P. and the chapter 7 trustee filed objections to the allowance of the claim. They did not challenge the validity of the penalties; they argued that the penalties should not be raised to the level of first-priority administrative expenses ahead of the unsecured creditors. The bankruptcy court agreed, denying the Commission's motions for summary judgment and payment of an administrative expense and holding that these punitive, postpetition, civil penalties did not constitute an administrative expense under 11 U.S.C. § 503(b)(1)(A), largely because they did not serve to benefit the estate in any way. The district court affirmed this decision.

### DISCUSSION

Because neither party objects to the bankruptcy court's findings of fact, the issue before us is purely one of law. Review is *de novo*. *See In re Sublett,* 895 F.2d 1381, 1383 (11th Cir.1990). Whether and when postpetition, punitive, non-tax penalties can be accorded administrative-expense status under section 503(b) is an issue of first impression in this circuit. We

---

**1.** All mention of findings by the bankruptcy court refers to the opinion of the bankruptcy court in Tuscaloosa (Wright, G.B.J.), to which this case was later transferred from Birmingham.

have several options: we can find that such penalties never qualify under section 503(b), that they always qualify, or that they sometimes qualify, depending on the circumstances. No circuit has addressed precisely this question.[2]

Section 503(b) reads in part:

> After notice and a hearing, there shall be allowed, administrative expenses, ... *including*—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, *including* wages, salaries, or commissions for services rendered after the commencement of the case;
>
> (B) any tax—
>
> (i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title; or
>
> (ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case; and
>
> (C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph....

(Emphasis added.) Other administrative expenses explicitly listed in section 503(b) include certain postpetition expenses incurred by creditors.

Section 503(b) uses the word "including" twice. According to section 102(3):

> \* \* \* \* \* \*
>
> "includes" and "including" are not limiting.
>
> \* \* \* \* \* \*

The legislative history of section 503(b), as well as the legislative history of other relevant sections of the Bankruptcy Code, is silent regarding the treatment of punitive postpetition penalties. It is clear from the face of the statute, however, that expenses not explicitly listed in section 503(b) can receive administrative-expense status in one of two ways, either as a nonlisted "actual, necessary" expense of preserving the estate under 503(b)(1)(A) or as a nonlisted administrative expense under 503(b) in general. Either way, there is room in the statute for courts to accord administrative-expense priority to postpetition expenses, and courts have given this status to certain categories of postpetition claims that are not explicitly listed in the statute. According to L. King, 3 *Collier on Bankruptcy* ¶ 503.03, at 503–17 (15th ed. 1991), "A court might well conclude that there are to be allowed as administrative expenses claims not necessarily precisely covered by the provisions of section 503(b).... Further, what constitute actual and necessary costs and expenses of preserving an estate might well be open to judicial construction."

Courts have held, for instance, that administrative-expense status is accorded to (1) damage claims for torts committed by a bankruptcy trustee, (2) compensatory penalties for violation of an injunction, and (3) compensatory penalties covering the costs of cleaning up environmental hazards.

In the instant situation, as previously stated, the postpetition penalties for which the ASMC is seeking administrative-expense status are not compensatory. They will not reimburse innocent victims of tortious conduct by a trustee or debtor in possession, nor will they be used to repair environmental damage.[3] Further, there is no evidence that any of the violations pose an imminent health hazard. If we grant administrative-expense status to these non-compensatory penalties, we will create a new category of postpetition costs entitled to first priority.

---

**2.** The Fourth Circuit in *United States Department of Interior v. Elliott,* 761 F.2d 168 (4th Cir.1985), a case on which appellant relies heavily, held that such penalties are an administrative expense, but *Elliott* although helpful, is not precisely on point because its reasoning is based on a since-repealed and perhaps slightly inapposite section of the former Bankruptcy Code. *See infra* II.F. for a discussion of *Elliott.*

**3.** Any actual cleanup costs were covered by the reclamation bonds. Even if the reclamation bonds did not adequately cover the costs, these penalties would still not be used by the state to reclaim the mining sites leased by N.P.

The ASMC presents an argument, consisting of three separate but related components, for according the penalties here administrative-expense status. The first part of the argument relies on *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), which, interpreting the former Bankruptcy Code, held that tort claims against a bankruptcy trustee were payable as administrative expenses even though they were not beneficial to the estate. The ASMC argues that the logic of *Reading*—that costs "normally incident to operation of a business" can be administrative expenses—applies to the penalties here in question. The ASMC next contends, relying on cases holding that a bankruptcy trustee cannot circumvent environmental protection laws and that the actual costs of environmental cleanup can be administrative expenses, that a Bankruptcy Code policy in favor of environmental protection mandates that punitive environmental fines should be treated the same as compensatory environmental fines. The ASMC finally argues that a federal policy mandating trustees' compliance with state law requires that all postpetition civil penalties receive administrative-expense status as "actual, necessary" costs of preserving the estate.

Although not convinced by all of the ASMC's arguments, we find that punitive, civil penalties assessed for postpetition mining activities qualify as an administrative expense under section 503(b)(1)(A). We do not base our decision on the Bankruptcy Code policies—such as fairness to claimholders or environmental protection—relied on by other courts that have granted administrative-expense status to costs that do not benefit the bankruptcy estate. Rather, we base our decision on the federal policy, embodied in 28 U.S.C. § 959(b), that trustees "operate" an estate in compliance with state law. In accordance with this policy, we hold that the penalties in question receive first priority, but only to the extent that they were incurred as a consequence of mining operations after the bankruptcy petition was filed and while the business was still "operating."

Our analysis begins with a review of the *Reading* case and an explanation of why it remains binding precedent. We next discuss why the policies of fairness and environmental protection do not justify awarding the penalties in this case first priority. We then explain why the policy of ensuring that trustees operate a property in compliance with state law mandates administrative-expense status for these penalties, and why the reasoning of the Fourth Circuit *Elliott* case supports our holding. Finally, we discuss why penalties incurred after an estate has ceased operating do not receive first priority.

A. Reading *and Administrative–Expense Priority for "Costs Ordinarily Incident to Operation of a Business"*

Appellant cites *Reading* and a line of cases employing its reasoning. In these cases, courts have created categories of costs that are entitled to administrative-expense status as "actual, necessary" costs of preserving the estate even though these costs do not confer an actual benefit on the estate. As appellees point out, none of these cases involves punitive penalties. The reasoning of these cases is nevertheless instructive.

Again, section 503(b) reads in part:

After notice and a hearing, there shall be allowed, administrative expenses, ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

One policy behind this section is "to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services." *United Trucking Serv., Inc. v. Trailer Rental Co., Inc. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 161 (6th Cir.1988) (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)). Obviously, without a guarantee of first-priority payment, third parties would not deal with a business in chapter 11 reorganization, and the goal of rehabilitation

could not be achieved. Another "overriding concern in the [Bankruptcy] Act [is] with keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." *Otte v. United States*, 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974). Thus, some courts have interpreted section 503(b)(1)(A) narrowly to apply only to those costs that either help to rehabilitate the business or to preserve the estate's assets, in other words, only to those costs that benefit the estate in some way.

In *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700 (9th Cir.1988), a case holding that a lessor was not entitled to administrative-expense priority for clean-up costs on its property caused by operation of the debtor's business, the Ninth Circuit stated that:

> [t]he statute is explicit. Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors.... The terms "actual" and "necessary" are construed narrowly so as "to keep fees and administrative expenses to a minimum." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982).... An actual benefit must accrue to an estate.

*Id.* at 706. The bankruptcy court and the district court in the instant case employed this reasoning in refusing to grant administrative-expense status to the ASMC penalties because paying such penalties would only deplete the estate rather than preserve it. The bankruptcy court stated that payment of the fines "would not have 'benefitted' or preserved this bankruptcy estate, the only valid purpose for which an administrative expense can be awarded under Section 503(b)(1)(A)." *N.P. Mining, supra*, 124 B.R. at 858.

Such a reading, however, ignores that there are other policies also involved in section 503(b). The Supreme Court has not construed the meaning of administrative expenses narrowly. Interpreting section 64(a)(1) of the former Bankruptcy Act (codified at 11 U.S.C. § 104(a)(1)), the predecessor to section 503(b), the Court, holding that tort claims were "actual and necessary" costs, stated:

> [D]ecisions in analogous cases suggest that "actual and necessary costs" should include *costs ordinarily incident to operation of a business*, and not be limited to costs without which rehabilitation would be impossible. It has long been the rule of equity receiverships that torts of the receivership create claims against the receivership itself; in those cases the statutory limitation to "actual and necessary costs" is not involved, but the explicit recognition extended to tort claims in those cases weighs heavily in favor of considering them within the general category of costs and expenses.
>
> In *some cases* arising under Chapter XI it has been recognized that "actual and necessary costs" are not limited to those claims which the business must be able to pay in full if it is to be able to deal at all. *For example, state and federal taxes accruing during a receivership have been held to be actual and necessary costs of an arrangement.* The United States, recognizing and supporting these holdings, agrees with petitioner that costs that form "an integral and essential element of the continuation of the business" are necessary expenses even though priority is not necessary *to* [emphasis in original] the continuation of the business.... We hold that damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to "actual and necessary costs" of a Chapter XI arrangement.

*Reading Co.*, 391 U.S. at 484–85, 88 S.Ct. at 1766–67 (1968) (emphasis added except where noted) (footnote omitted).

If postpetition costs "ordinarily incident to operation of a business" that do not confer a benefit on the estate can indeed qualify as "actual, necessary" expenses of preserving the estate, then a strong case can be made that when a licensed business operates in the regulated atmosphere of strip mining in Alabama, incurring *regulatory penalties is a cost ordinarily incident to operation of a business* and should be

accorded administrative-expense priority. This is precisely the holding of the Bankruptcy Court for the District of Kansas in *In re Bill's Coal Co.*, 124 B.R. 827 (D.Kan. 1991), the only case exactly on point. The case concerned whether postpetition punitive penalties for strip mining violations are entitled to administrative expense status under section 503(b) of the current Bankruptcy Code. The bankruptcy court, after quoting *Reading,* stated:

> [I]n the regulated atmosphere of the strip mining industry, a fine for the violation of environmental regulations should be considered "a cost ordinarily incident to operation of a business." This is sufficient for administrative expense status. A connection to some benefit to the estate is not required.

*Id.* at 830.

The *Reading* Court did not hold, however, that in *all cases* costs normally incident to operation of a business are administrative expenses. Only in *"some cases,"* the Court stated, do they merit such status. Additionally, appellees argue that *Reading* is inapposite because it addresses compensatory payments and, more importantly, interprets a provision of the former Bankruptcy Code. Appellees further contend that whatever duty the trustee owes to *"operat[e] ... a business"* in accordance with strip mining laws, that duty—at least with respect to the lion's share of the fines assessed against the estate—is not owed here because the business had already ceased operating when most of the fines were levied. This part of our inquiry, therefore, poses three questions: First, is the *Reading* Court's interpretation of section 64(a)(1) of the superseded Bankruptcy Act relevant to interpreting section 503(b)(1)(A) of the current Code? Second, under what circumstances should a court accord administrative-expense status to costs that are ordinarily incident to operation of a business yet do not confer a benefit on the estate? Third, was there a point, prior to the conversion to chapter 7, when N.P. had ceased operating, such that a cost incident to *operation* was no longer chargeable against the estate?

**B.** *Must* Reading's *Interpretation of the Former Code Be Followed in Interpreting the Current Code?*

Appellees argue that *Reading* is inapposite because in that case, the Supreme Court interpreted a provision of the former Bankruptcy Code. The Ninth Circuit in *Dant & Russell* justified its narrow reading of section 503(b)(1)(A) by stating that the statutory language under the present Code differs from language of the analogous provision of the former Code and calls for a showing of benefit to the estate:

> Section 64(a)(1), the predecessor to section 503(b)(1)(A)[,] used the term "including" ("including the necessary costs of preserving the estate")[;] Congress in the revised statute deleted the term because of the implication that first priority claims included some addition to those that serve to preserve the bankrupt estate.

*Dant & Russell,* 853 F.2d at 706 n. 8. We disagree with this interpretation of section 503(b)(1)(A). A comparison of the two provisions shows that they are, in relevant part, essentially identical. Although subsection (b)(1)(A) does not itself contain the word "including" before the words "actual, necessary costs and expenses," the passage immediately preceding subsection 503(b)(1)(A) does contain the word. The term was in fact not deleted:

**11 U.S.C. § 104(a)(1) (repealed)**

(a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the *costs and expenses of administration, including* the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition.

> \*    \*    \*    \*    \*    \*

**11 U.S.C. § 503(b)(1)(A)**

(b) After notice and a hearing, there shall be allowed, *administrative expenses, ... including—*

(1)(A) the actual, necessary costs and expenses of preserving the estate, *including* wages, salaries, or commissions

for services rendered after the commencement of the case....

The use of the term "including" in the above-quoted statutory language indicates that in both the current and the former provisions, Congress did intend that first priority claims include claims other than those that serve to preserve the bankrupt estate. Because the two provisions are essentially identical, the reasoning of the Supreme Court in *Reading* that postpetition costs "ordinarily incident to operation of a business" can be actual, necessary costs entitled to administrative-expense priority is still valid. Indeed, courts interpreting section 503(b)(1)(A) under the current Code have cited *Reading* as precedent. *See, e.g., Lancaster v. Tennessee (In re Wall Tube & Metal Prods.)*, 831 F.2d 118, 123 (6th Cir.1987); *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200, 202 (1st Cir.1985).

## C. *Administrative–Expense Status for Compensation of Innocent Victims of the Estate's Actions*

According to the *Reading* Court, administrative-expense status may sometimes be given to postpetition costs ordinarily incident to the operation of a business that do not benefit the estate. The Court held that the statutory objective of "fairness to all persons having claims against an insolvent," *Reading*, 391 U.S. at 477, 88 S.Ct. at 1763, mandated that those injured by a trustee's negligence be entitled to first priority. The Court reasoned that postpetition tort claims should be treated as actual and necessary expenses because, in part:

[i]n considering whether those injured by the operation of the business during an arrangement should share equally with, or recover ahead of, those for whose benefit the business is carried on, the latter seems more natural and just. Ex-

isting creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent.

*Id.* at 482–83, 88 S.Ct. at 1765. This concern does not apply in the instant case, however, because the ASMC fines do not represent compensation for any injury. A policy of fairness to persons injured by the estate, therefore, does not dictate that the postpetition penalties levied by the ASMC receive first priority. In fact, fairness is the reason that punitive penalties have historically been disfavored in the Code.[4]

The *Reading* Court also justified giving tort claims first priority by reasoning that such a holding would encourage receivers to insure adequately the businesses they operate. *Reading*, 391 U.S. at 483, 88 S.Ct. at 1766. Here, the equivalent of insurance was the reclamation bonds, the premiums of which were in fact paid by the chapter 11 trustee. Because the ASMC penalties had no connection to the actual cost of land reclamation, their status as a first-priority administrative expense would neither encourage nor discourage the purchase of reclamation bonds.[5]

In *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200 (1st Cir.1985), the First Circuit extended the rationale of *Reading* to grant administrative-expense priority—as "actual, necessary costs and expenses of preserving the estate"—to a compensatory civil fine. The fine had been levied against a debtor in possession for violating a temporary injunction against committing a public nuisance by operating its laundry in violation of a zoning ordinance. The court reasoned that compensating plaintiffs, who were neighbors of the laundry business, for the adverse effects of the estate's violation of the injunction was equivalent to

---

**4.** Prepetition punitive penalties receive a lower level of priority than prepetition compensatory penalties in chapter 7 distribution. *See* 11 U.S.C. § 726(a)(2) & (4). Under a repealed provision of the former Code, punitive penalties of governmental units were completely disallowed from recovery from the estate. *See* 11 U.S.C. 93(j) (repealed).

**5.** Ensuring proper reclamation-bond coverage is accomplished by the state law that requires a company to take out such coverage before it can engage in surface mining. *See* Ala.Code § 9–16–89.

compensating victims of an estate's negligence. The court, invoking *Reading*'s emphasis on fairness to innocent persons injured by the estate's actions, rejected the argument that claims that do "not aid the rehabilitation of the business or preserve a maximum of assets for distribution" should not receive administrative-expense priority. *Charlesbank Laundry,* 755 F.2d at 202. The court concluded, "If fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then, *a fortiori,* an intentional act which violates the law and damages others should be so treated." *Id.* at 203. Because its holding is based on the policy of fairness to innocent victims of the estate, *Charlesbank* also fails to provide a justification for granting first priority to penalties that are purely punitive in nature.

### D. *Administrative–Expense Status for Environmental Cleanup*

Appellant puts forward another policy supporting granting of administrative-expense status here: environmental protection. In *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), the Supreme Court held that a bankruptcy trustee could not abandon a debtor's contaminated property in contravention of a state statute designed to protect the public health or safety from an identified hazard. The Court partly based it decision on "repeated congressional emphasis on its 'goal of protecting the environment against toxic pollution.'" *Id.* at 505, 106 S.Ct. at 761 (quoting *Chemical Manufacturers Ass'n, Inc. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 143, 105 S.Ct. 1102, 1117, 84 L.Ed.2d 90 (1985)). The Court also described this policy as "Congress' undisputed concern over the risks of the improper storage and disposal of hazardous and toxic substances." *Midlantic,* 474 U.S. at 506, 106 S.Ct. at 762. The Court held:

> Where the Bankruptcy Code has conferred special powers upon the trustee and where there was no common-law limitation on that power, Congress has expressly provided that *the efforts of the trustee to marshall and distribute the assets of the estate must yield to governmental interest in public health and safety.*

*Id.* at 502, 106 S.Ct. at 760 (emphasis added).

Following this reasoning, the Sixth Circuit, in *Lancaster v. Tennessee (In re Wall Tube & Metal Products Co.),* 831 F.2d 118 (6th Cir.1987), held that the actual postpetition costs incurred by the state in cleaning up a chapter 7 estate's hazardous waste site were entitled to administrative-expense priority. The court based its decision on several factors. First, relying on the policy of subordinating the interests of the estate to environmental protection, the court held that the power of the trustee "must yield to the governmental interests in health and safety, which includes using assets of the estate for necessary cleanup." *Id.* at 123 (quoting *In re Mowbray Engineering Co.,* 67 B.R. 34 (Bankr.M.D.Ala.1986)). Thus, ensuring the prompt cleanup of health hazards makes "it proper that the response costs incurred by Tennessee and recoverable under CERCLA be deemed an administrative expense." *Id.* Second, the court invoked the rationale of *Reading* that "[e]xisting creditors ... should [not] be allowed to escape [their] dilemma at the risk of imposing it on others equally innocent." In *Wall Tube,* one assumes that the innocent persons are the taxpayers forced to pay for the cleanup. Third, because, according to *Midlantic,* the trustee could not abandon the contaminated property in contravention of the state's environmental law, the trustee also could not "maintain[ ] or possess[ ] the estate in continuous violation of that same law," which would result in *"an ongoing, potentially disastrous health hazard* without remedy from those at fault." *Id.* at 122 (emphasis added). The court concluded:

> It is undisputed that the hazardous wastes *still within the debtor's estate* ... presented a danger to the public's health and safety. The State of Tennessee, in the absence of compliance by the debtor's estate, was entitled by its own law to expend funds to assess the gravi-

ty of the environmental hazard. We thus find those expenses to be actual and necessary, both to preserve the estate in required compliance with state law and to protect the health and safety of a potentially endangered public.

*Id.* at 124 (emphasis added).

None of these factors is present in the instant case. Here, there is no threat to public health or safety. Nor will the fines pay for environmental cleanup. Further, the mining sites—which N.P. leased and did not own—are not part of the bankruptcy estate, so abating violations there does not even provide an indirect benefit to the estate by bringing the property into compliance. Because these punitive penalties will not be used to abate any identified environmental hazard caused by the estate, they should more properly be thought of simply as civil penalties no different from penalties for violating antitrust or securities laws. In short, although this case involves environmental penalties, no policy in favor of environmental protection justifies giving these penalties administrative-expense priority.

E. *Compliance with State Law as an Administrative Expense*

Appellant raises another federal policy, one that we hold does justify giving first priority to punitive penalties that are ordinarily incident to operation of a business. The ASMC points to 28 U.S.C. § 959(b), which states, in relevant part:

[A] trustee ... appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof.

The Alabama SMCRA requires that operators avoid violating specified environmental rules, abate violations when they do occur, and pay fines for noncompliance. Because an operator outside the protection of the bankruptcy laws would be bound to pay these fines, the policy of section 959(b) that state law govern the actions of a trustee mandates that these fines be paid. In *Midlantic,* the Supreme Court stated:

Title 28 U.S.C. § 959(b) provides additional evidence that Congress did not intend for the Bankruptcy Code to preempt all state laws.... Petitioners have contended that § 959(b) is relevant only when the trustee is actually operating the business of a debtor, and not when he is liquidating it. Even though § 959(b) does not directly apply to an abandonment under § 554(a) of the Bankruptcy Code—and therefore does not delimit the precise conditions on an abandonment—the section nevertheless supports our conclusion that Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of a trustee's powers.

*Midlantic,* 474 U.S. at 505, 106 S.Ct. at 761.

We find that a policy of ensuring compliance by trustees with state law is sufficient justification to place civil penalties assessed for postpetition mining operations in the category of the "some cases" in which "costs ordinarily incident to operation of a business," *Reading,* 391 U.S. at 484, 88 S.Ct. at 1766, are accorded administrative-expense priority. We agree with the bankruptcy court in *Bill's Coal* that "in the regulated atmosphere of the strip mining industry, a fine for the violation of environmental regulations should be considered 'a cost ordinarily incident to operation of a business.'" *Bill's Coal,* 124 B.R. at 830. Even though these civil penalties are not compensatory, it makes sense that when a trustee or debtor in possession operates a bankruptcy estate, compliance with state law should be considered an administrative expense. Otherwise, the bankruptcy estate would have an unfair advantage over non-bankrupt competitors. A mining operation could, under the protection of chapter 11, cut costs by ignoring safety and environmental violations.

However, although we are mindful that the Alabama statute requires mining opera-

tors to abate past violations and that penalties are assessed for a failure to abate, *see* Ala.Code § 9–16–74, we exclude from consideration as an administrative expense any penalty assessed postpetition for the failure of the debtor in possession or the trustee to abate a prepetition violation of the statute. A requirement that a debtor in possession or a trustee expend funds in the bankruptcy estate for the purpose of abating prior mining violations would deprive the estate of its "new day" beginning and frustrate the purpose of the bankruptcy statute. The ASMC has as one of its remedies the right to secure an administrative or court order mandating cessation of the operation of a mine by an operator who violates any of the provisions of the mining act and regulations. If prior to bankruptcy the Commission has not sought abatement of certain practices of a mining operator we deem those violations not to be of such consequence as to require the bankruptcy estate liable for penalties assessed for failure to abate after the filing of a petition.

We hold that under the reasoning of *Reading* and the policy of section 959(b), punitive civil penalties assessed as a consequence of the operation of a bankruptcy estate's business are "actual, necessary costs and expenses of preserving the estate" under section 503(b)(1)(A).

### F. *United States Department of Interior v. Elliott*

*United States Department of Interior v. Elliott (In re Elkins Energy Corp.)*, 761 F.2d 168 (4th Cir.1985), a case whose relevance is debated by the parties, further supports our holding. In that case, the Fourth Circuit confronted the status of just these types of penalties—punitive civil penalties assessed for postpetition violations of a surface mining statute—and determined that they were entitled to administrative-expense priority. The opinion is based on the court's interpretation of section 57(j) of the former Bankruptcy Act (codified at 11 U.S.C. § 93(j)). Section 57(j), since repealed, disallowed punitive penalties owed to governmental units. It was replaced by section 726(a)(4) of the current Code, which allows prepetition punitive penalties but

gives them a priority below that of claims held by unsecured creditors. Section 726(a)(4) is, like the rest of the Code, silent about postpetition penalties.

*Elliott*'s discussion is focused on whether punitive, postpetition penalties should be allowed under section 57(j). At the end of the opinion, the court adds that not only should the fines be allowed, they should also receive administrative-expense priority, but offers no explanation. Nevertheless, an examination of *Elliott's* interpretation of section 57(j), in conjunction with a review of section 726(a)(4) of the current Code, is instructive.

Section 57(j) read:

Debts owing to the United States or to any State or any subdivision thereof as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction or proceeding out of which the penalty or forfeiture arose, occasioned thereby and such interest as may have accrued on the amount of such loss according to law.

On the face of it, one might assume that this language applied equally to postpetition and prepetition punitive penalties. However, in *Boteler v. Ingels*, 308 U.S. 57, 59–60, 60 S.Ct. 29, 31–32, 84 L.Ed. 442 (1939), the Supreme Court, holding that postpetition tax penalties were not disallowed by section 57(j), stated that "[a]fter bankruptcy, [the section] does not purport to exempt the trustee from the operation of state laws, or to relieve the estate from liability for the trustee's delinquencies." *See also* 3 J. Moore & L. King, *Collier on Bankruptcy* ¶ 57.22[1], at 386 (14th ed. 1977) (noting that section 57(j) "applies only to claims against the bankrupt arising *prior to bankruptcy*. It does not propose to exonerate a trustee or receiver in bankruptcy from penalties which he incurs in the course of continued operation of the bankrupt's business").

The *Elliott* court thus decided that there was no reasoned distinction between postpetition tax penalties and any other postpetition penalty. Very simply, it was the

postpetition nature of these punitive fines that took them out of the coverage of section 57(j). The ASMC takes this to mean that there is no reasoned distinction between postpetition tax penalties and other postpetition penalties under *section 503(b).* The rationale for determining administrative-expense status is different, though. Section 503(b) begins with the *premise* that all the costs to be considered are postpetition and *some* of them will receive administrative-expense priority.

Nevertheless, bearing in mind the policy of 28 U.S.C. § 959(b), one sees that the *Elliott* court's reading of section 57(j) of the former Act lends support to giving punitive penalties administrative-expense status. Section 726(a)(4) of the current Code made explicit what had been implicit in section 57(j): the policy of disfavoring punitive penalties applies only to *prepetition* punitive penalties. A lower level of priority is given to:

> any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, *arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty,* forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim....

(Emphasis added.) Even though the Bankruptcy Code is silent about postpetition punitive penalties, Congress's revision of this provision to apply explicitly only to prepetition penalties seems to be a recognition of the policy of section 959(b) and the *Boteler* Court's injunction that *after bankruptcy,* the Code "does not purport to exempt the trustee from the operation of state laws." 308 U.S. at 59–60, 60 S.Ct. at 31–32.

The *Elliott* court also justified its decision on the ground of deterrence, stating that creditors, while innocent of a debtor's prepetition penalties, are, after the chapter 11 filing, in a position to influence the actions of the bankruptcy estate, and, more importantly, are in a position to benefit from the estate's noncompliance with the law. Echoing the logic of the *Reading* Court in finding that holding the estate liable for tort damages would encourage trustees to purchase adequate insurance coverage, the *Elliott* court stated, "Subjecting the estate to postpetition penalty claims will encourage the creditors to ensure that the debtor is complying with the law while at the same time ensure that violations of law do not go unpunished." *Elliott,* 761 F.2d at 172.

### G. Was the Trustee "Manag[ing] or Operat[ing] the Property" When the Fines Were Incurred?

Appellees argue that the great majority of the fines should not be allowed because they were assessed after the business had essentially ceased all operations upon the appointment of the chapter 11 trustee. All mining operations had ceased and the trustee's only duty was to keep alive a coal-brokering contract: therefore, the trustee was not "operating" the estate and hence neither the policy of 28 U.S.C. § 959(b) that a trustee "manage and operate a property" in compliance with state law nor the language of *Reading* that "costs incident to *operation* of a business" is implicated.

A number of courts have held that section 959(b) does not apply when a business's operations have ceased and its assets are being liquidated. *See, e.g., Walker v. Maury County (In re Scott Housing Systems, Inc.),* 91 B.R. 190 (Bankr.S.D.Ga. 1988); *In re Security Gas & Oil, Co.,* 70 B.R. 786, 796 (Bankr.N.D.Cal.1987). In *Matter of Bourne Chemical Co.,* 54 B.R. 126, 135 (Bankr.D.N.J.1984), the Bankruptcy Court for the District of New Jersey held that "[s]ection 959(b) is applicable only where the property is being managed or operated for the purpose of continuing operations." Interpreting 28 U.S.C. § 125, the predecessor to 28 U.S.C. § 959, Judge Learned Hand stated, "Merely to hold matters in the status quo; to mark time, as it were; to do only what is necessary to hold the assets intact; such activities are not a continuance of the business." *Vass v. Conron Bros. Co.,* 59 F.2d 969, 971 (2d Cir.1932). For the same reasons, penalties incurred when a trustee is merely maintaining an estate for later distribution of assets

cannot be considered "costs ordinarily incident to *operation* of a business." Therefore, they also cannot be "actual, necessary costs or expenses of preserving the estate" and administrative expenses under section 503(b)(1)(A).

The chapter 11 trustee administered the estate for approximately ten months. Within five weeks of taking control, however, he determined that rehabilitation would be impossible and he filed a motion to have the case converted to chapter 7. Having thus quickly determined that rehabilitation would be impossible, the trustee, during the ten months, essentially preserved the assets of the estate. He directed an employee to abate a small fraction of the violations and also continued the coal brokering first engaged in by the debtor in possession to keep alive the contract with Scott Paper Company. The trustee stated in an affidavit that "[w]hen I was appointed as Trustee, I began supplying Scott Paper Company through a brokering system as well, purchasing coal from Burleson & Mullins Coal Company at $34.50 per ton F.O.B. barge, for a net profit of approximately $5.00 per ton to the estate." Although N.P. under the trustee's administration was not *entirely* inactive, it appears that the trustee engaged in coal brokering merely to protect an asset of the estate and that the trustee was essentially holding matters in status quo. Because the business was not being administered for the purpose of continuing operations after the trustee took control, the policy of section 959(b) applies only with respect to those fines assessed for mining operations after the petition was filed and before the chapter 11 trustee took control.

Further, because the mining operations had ceased completely, the estate was not able to gain an unfair advantage over competitors by cutting costs in its surface mining operation by ignoring the ASMC fines. We hold, therefore, that the penalties incurred by the estate after the appointment of the chapter 11 trustee, which in this particular case marked the ceasing of the business's operations, are not entitled to administrative-expense priority. *See In re Chateaugay Corp.*, 112 B.R. 513, 525

(S.D.N.Y.1990) ("*To the extent that* [the debtor] continues to own and operate sites post-petition where there has been a release or threatened release of hazardous waste, [the debtor] is, under the law, under a continuing obligation to comply with the environmental laws.... In addition, *for the same reasons,* civil penalties for post-petition violations would also be entitled to be treated as administrative expenses.") (emphasis added).

## H. *Issues on Remand*

Because the bankruptcy judge disallowed all of the state's claims for penalties, it is necessary for us to remand for the bankruptcy court to determine the amount of postpetition fines assessed by ASMC that are directly attributable to the operation of the mines from the date the petition was filed until the mines ceased operating, which date has been fixed as the date the trustee was appointed. For the sake of clarity we emphasize that none of the cumulative assessments by the ASMC for violations prior to the filing of the petition are to receive administrative-expense priority.

## CONCLUSION

In conclusion, we hold the following with respect to coal mining penalties assessed by the ASMC in the context of bankruptcy proceedings: (1) Penalties assessed prior to and subsequent to the filing of a bankruptcy petition for mining violations that occur prior to the filing of a petition shall not be given administrative expense status; (2) penalties assessed for mining violations that are sustained during the operation of a mine by the debtor in possession or the trustee shall be given administrative expense status upon the condition that the ASMC promptly file its assessment claim for each assessment with the clerk of the Bankruptcy Court as well as notifying the debtor in possession or trustee.

Upon remand, the bankruptcy court can determine which of the state's claims are eligible, if any, for administrative expense status, without taking into consideration whether in this case the ASMC filed its

postpetition claims separately and promptly as required in (2) above.

REVERSED AND REMANDED.