KENNEDY, Circuit Judge,
dissenting.
Because compliance with the Employee Retirement Income Security Act (“ERISA”) is a statutory obligation and because the costs of complying with a regulatory scheme are, I believe, administrative expenses, regardless of whether they otherwise benefit the estate, I respectfully dissent.
The issue presented by this case is whether all ERISA minimum funding contributions accrued by a Chapter 11 debtor post-petition should receive priority status as administrative expenses, regardless of the particular liabilities to which those contributions pertain. The Pension Benefit Guaranty Corporation (“PBGC”) says “yes,” arguing that payment of minimum funding contributions, regardless of how many employees actually work for a debtor post-petition or whether the contributions encompass accumulated funding deficits, is a prerequisite to the debt- or’s continued participation in its pension plan(s), and therefore essential to the debt- or’s ability to continue to operate as a business. Since they are essential to its operation, they are a benefit to the estate. The Debtors say “no,” reasoning that the portion of minimum funding liability not directly attributable to employees working for a debtor post-petition does not benefit the estate because it pertains only to liabilities incurred pre-petition. Ultimately, the case hinges on whether the ability to continue to participate in an ERISA pension fund plan constitutes a benefit to the estate. Because such participation enables a debtor to operate as a business, and because such participation is dependent upon full payment of the minimum funding requirements, I believe the minimum funding contributions claimed by the PBGC should receive priority status.
I agree with the PBGC that costs of complying with a regulatory scheme are administrative expenses, regardless of whether they “benefit the estate” in a practical way. The PBGC cites Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), in which claims for torts committed by a debtor while acting in furtherance of its business received administrative priority. The Reading Court discussed with approval eases suggesting that “ ‘actual and necessary costs’ should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible.” Id. at 483, 88 S.Ct. at 1765-66. Likewise, the Reading Court rejected the claim that administrative priority “should be given only to those expenditures without which the insolvent business could not be *822 carried on,” such as contracts with suppliers, employees, and landlords. See id. at 477, 88 S.Ct. at 1762.
Here, the debtor and its employees continued to participate in the pension plan. The cost of continuing in the plan was determined by the plan and ERISA.
The PBGC also relies heavily upon Lancaster v. State of Tennessee (In re Wall Tube & Metal Prods. Co.), 831 F.2d 118 (6th Cir.1987), in which the State of Tennessee expended funds to comply with state environmental law by removing hazardous wastes from the property of the debtor company. The Court held that those costs, recoverable as response costs under CERCLA, were entitled to administrative expense priority as actual and necessary costs of preserving the estate because the debtor could not have maintained itself in continuous violation of the state environmental laws. See id. at 122-124; see also Alabama Surface Mining Comm’n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.), 963 F.2d 1449, 1458-59 (11th Cir.1992) (civil penalties for post-petition violation of state strip mining law are administrative expenses); United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997, 1009-10 (2d Cir.1991) (costs necessary for estate to comply with environmental laws are administrative expenses)
The majority attempts to distinguish environmental laws from costs due to compliance with other laws. Although protection of the environment is an important goal, so is protection of pension funds. More importantly, the statutes at issue do not value certain regulations more than others. If compliance with a given statute or regulation is necessary to operate as a business, then the costs of such compliance necessarily should be an administrative expense.
Further, only four of the six acceptable actuarial cost methods contain an actuarial accrued liability component. As the PBGC notes, if only normal costs can be administrative expenses, then the supposedly abstract test for administrative expense status will turn in part on the complete fortuity of whether the debtor at issue adopted an actuarial method with a “non-normal” component.
I would hold that the entire claim of the PBGC receive administrative expense priority. The PBGC performed the post-petition service of providing the Debtors with the benefit of continued participation in the Plan, which in turn enabled Debtors to operate their business post-petition. Although the Debtors assert that they incurred their liability for the service and experience costs at issue pre-petition (because the Plan amendment, incorrect actuarial assumptions, and attempts to correct those assumptions all occurred during the Plan year ending in 1989), the fact remains that the actuarial accrued liability expenses claimed by the PBGC represent only the amortized portion of the service and experience costs attributable to the period during which the Debtors operated post-petition. Ultimately, those amortized costs are the costs of the benefit of doing business post-petition. Selective payment of minimum contributions, which implies that only a part of the entire requirement is the truly “actual and necessary” cost of preserving the estate, is impermissible because participation in ERISA is an all-or-nothing proposition: once an employer chooses to participate, it must pay all accumulated minimum funding obligations. See 29 U.S.C. §§ 1082(a), 1362(c).
One of the eases cited by the Debtors explains the purpose of granting administrative expense priority to certain debts:
Congress granted priority to administrative expenses in order to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate’s creditors. Congress reasoned that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors.
Trustees of the Amalgamated Ins. Fund v. McFarlin’s, Inc., 789 F.2d 98, 101 (2d Cir.1986) (citations omitted); see also United Trucking Serv., Inc. v. Trailer Rental Co., Inc. (In re United Trucking Serv., Inc.), 851 F.2d 159, 161 (6th Cir.1988) (purpose of ad *823 ministrative expense provision “is to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services”). The above description of the purpose behind administrative expense priority illustrates precisely why the debts claimed by the PBGC should receive such priority. The money expended by the PBGC on behalf of the Debtors allowed them to remain in business, thereby providing them with an opportunity to rehabilitate themselves for the benefit of all creditors. Although hindsight may reveal now that the debts incurred by the Debtors to the Plan in fact were not “worth it,” in the sense that more money was lost by continued participation in the Plan than was gained by continued business operations, whether minimum funding contributions should be construed as administrative expenses should not turn on whether continued participation in a plan was good business judgment in a particular ease. Continued payment of ERISA obligations provided the Debtors with a chance at rehabilitation. Denying administrative expense priority whenever attempted rehabilitation proves to be too costly would undermine the goal of Congress to encourage solvent entities to help bankrupt debtors. Although the PBGC is an unusual creditor because it has no choice but to step in and assume the obligations of a plan, denying priority to debts which the PBGC incurred by helping the Debtors remain in business is analytically unsound and creates precedent harmful to deserving creditors in other cases.
The continued and present ability of the debtor to participate in the fund, which allows a debtor to operate normally requires payment to PBGC in accordance with ERISA.
Accordingly, I would hold that the funding required by statute and regulation is a current and fixed cost of providing pension benefits.